FILED (DROP BOX)

MAR 2 5 2021

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**



21-CV-410 PGM

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* by KHUSHWINDER SINGH <br><br> Plaintiff, <br><br> vs. <br><br> ALEDADE, INC.; a Delaware Corporation and related corporations and LLC's, <br><br> Defendants. | NO. <br><br> COMPLAINT AND JURY DEMAND <br><br> **Filed Under Seal** <br> pursuant to <br> 31 U.S.C. §3730(b)(2) |

COMES NOW the United States of America, by and through Khushwinder Singh, qui tam as Relator, and for a cause of action alleges as follows:

## I. NATURE OF THE ALLEGATIONS

A.      Defendant Aledade has helped set up a series of Accountable Care Organizations ("ACOs") which bill Medicare and take advantage of the Medicare Shared Savings Program ("MSSP"). Aledade receives funds through a shared incentive program with the ACOs it helps, splitting the shared savings with the healthcare practice. The Defendant promotes increasing revenue through a series of tools which cause physicians to focus on increasing specific higher-weighted Hierarchical Condition Category ("HCC") risk scores by "upcoding" medical diagnoses. Through its promotional materials and services, Aledade has repeatedly violated CMS guidelines intended to avoid overbilling and upcoding. The result is that Aledade causes

**COMPLAINT AND JURY DEMAND - 1**

Medicare overbilling by increasing Medicare's burden to pay ACOs for shared savings under the MSSP program.

## I. JURISDICTION and VENUE

1.1     Jurisdiction exists pursuant to 31 U.S.C. §3730(b)(1) and 31 U.S.C. §3732 in that this action seeks remedies on behalf of the United States of America for violations of 31 U.S.C. §3729 by the Defendants.

1.2     On information and belief, the "allegations or transactions" upon which this suit is based have not been publicly disclosed in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit or investigation, or from the news media. 31 U.S.C. 3730(e)(4)(A).

1.3     Knowledge obtained by the U.S. Government was the result of a disclosure made by the Relator, including a disclosure on or about March 23, 2021 to the DHHS Office of Inspector General and the government's False Claims Act counsel.

1.4     The *qui tam* Plaintiff is an original source in that he "has direct and independent knowledge of the information on which the allegations are based." 31 U.S.C. §3730(e)(4)(B). He has been providing information through this litigation and has previously provided and offered to provide information to agents of the United States Government in connection with this matter.

1.5     Aledade, Inc. is a Delaware Corporation, but a search of the Delaware Secretary of State reflects numerous Aledade LLC's. This complaint is intended to cover those parts of Aledade and any related organization responsible for the fraud caused by its encouragement of healthcare practitioners to overbill Medicare and other allegations herein  They are referred to herein as "Aledade".

1.6     Aledade, Inc., and "Aledade" transact business in Seattle, Washington, within the Western District of Washington, as well as in other states of the United States of America.

COMPLAINT AND JURY DEMAND - 2

1.7     Venue exists in this District pursuant to 31 U.S.C. §3730(b)(1) in that Defendants are qualified to do business in the State of Washington and transact substantial business in the District.

## II. PARTIES

2.1     The Defendant Aledade is an Delaware corporation with its principal place of business in Bethesda, Maryland, and is engaged in the business of, *inter alia*, contracting with healthcare providers to improve revenue for their practices.

2.2     Relator Khushwinder Singh resides in Washington State.  He is an employee of Aledade, and was at material times employed in the capacity of Senior Medical Director of Risk and Wellness Product.

2.3     The United States Government is a party hereto.  On information and belief, its Department of Health and Human Services pays Medicare benefits directly to physician practices, ACOs, and/or Aledade within this judicial district.

## III. STATEMENT OF FACTS

3.1     The practices identified herein have been ongoing for a period of years.  Relator is a newer employee of Aledade with business responsibility related to communications with Aledade's partner ACOs.  His duties included developing and improving clinical coding guidance to healthcare business partners, and checking and improving the underlying logical reasoning and medical coding basis for Aledade's algorithms.  Allegations herein are made based on his personal knowledge.

**A.     Healthcare Providers Organize as Accountable Care Organizations for the MSSP**

3.2     Accountable Care Organizations in the Medicare Shared Savings Program earn shared savings from the Center for Medicare and Medicaid Services ("CMS") when performance year expenditures for their assigned Medicare fee-for-service ("FFS") population are lower than updated historical benchmark expenditures.  Thus, ACOs are incentivized to arrange patient care

COMPLAINT AND JURY DEMAND - 3

to minimize Medicare expenses for patients when they visit multiple providers or have hospital admissions. The goal is to streamline patient care.

3.3     The ACOs are incentivized to maintain good care for patients, but also required to accurately report diagnoses code  for the patients under management. For patients that are complex i.e. sicker than an average Medicare beneficiary, accurate reporting of all the patients' chronic conditions is important to illustrate the complexity of management of such high risk patients.

3.4     ACOs of course must comply with CMS guidelines and the Code of Federal Regulations. The CMS manual for appropriate billing and coding requires that the service should be medically necessary and the diagnosis coding should meet the documentation and coding guidelines set forth in the ICD-10 coding manual.

3.5     Relevant CMS guidance reflects a strong aversion to informing healthcare providers about the economic impact of billing and coding decisions.  For example, when writing a physician query to get clarity regarding documentation, the query should include the clinical indicators, and should not indicate the impact of reimbursement.  CMS guidelines are to avoid putting financial data in front of providers when they are making diagnostic decisions.[1]

3.6     Placing Risk Adjustment Factors ("RAFs") on a coding tool distributed to physicians and their coders, as well as other Aledade tools, does indicate the impact of reimbursement and will adversely affect accurate code selection. Aledade does this and it should not.

3.7     This same CMS audit document also discusses who can amend a chart. A third party who was not directly involved with the clinical care of the patient is not permitted to do so: "Unacceptable Amendment – It is unacceptable for a third party that was not involved in the treatment and evaluation of the patient (e.g., coder, reviewer) to amend the medical record or

---

[1]  Contract-Level Risk Adjustment Data Validation Medical Record Reviewer Guidance In effect as of 03/20/2019, at p. 72

**COMPLAINT AND JURY DEMAND - 4**

**Teller Law**
1139 34th Ave
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

query the provider for additional diagnoses or clarifications not documented in the original medical record."[2]

3.8    While Aledade claims that it does not allow its employees to guide physician choices in specific situations, on information and belief, this is occurring, and Aledade employees, as well as the App and other guidance and communications referred to herein, do in fact communicate amendments or potential amendments directly, and also convey improper queries to providers.

3.9    Because of the foregoing facts, the accuracy of the diagnoses codes-based data reported to CMS through these improper coding and claims submission practices is faulty, leading to improper payments made to Aledade ACOs.

3.10    These practices, including those detailed below, cause Aledade's partner ACO healthcare provider practices to defraud Medicare.

**B.    Aledade's Focus on HCC "Weighted Codes" Causes Fraudulent Upcoding**

3.11    Since at least 2016, Aledade staff overseeing the physician practices, including those with job titles of ACO Director, ACO Coordinator, and Practice Transformation Specialist ("PTS") have been heavily involved in the HCC coding education, leading to preferred HCC code selection and improper billing activities of Aledade's partner ACOs.

3.12    Aledade created a digital application it calls the "Aledade App" (or "the App") with a feature called the "Daily Huddle" in order to promote the use of HCC code suggestions focusing on "weighted codes" with greater HCC risk value. Aledade employs practice-facing staff to recommend to the practicing physician groups that they use the higher-weighted HCC codes for office visits frequently. Due to increased uptake by the ACOs of the higher-weighted HCC codes, and billing of higher weighted HCC suggestions, both Aledade and the practice profit more.

3.13    Multiple internal tools and data analytics dashboards were created for monitoring the progress of the practices via the Daily Huddle. From it Aledade staff can see how the HCC

---

[2] *Id.* at p. 60.

COMPLAINT AND JURY DEMAND - 5

**Teller Law**
1139 34th Ave
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

risk categories are viewed and billed by the practice. ACO coordinators and PTSs are employed to maintain oversight of the individual practices' metrics – the "Risk billed" and "Risk viewed" metrics – to influence and promote the use of higher-risk-weighted diagnosis codes by providers.

3.14 Aledade's staff meetings with practices and physicians emphasize the use of these metrics to prioritize the use of weighted codes instead of non-weighted codes, including by encouraging the practice staff at the participating physician practices to manipulate and edit patients' problem lists in their medical records, including removing non-weighted codes and replacing them with weighted codes, and/or editing patient records to reflect HCC weighted code requirements.

3.15 Aledade's practice is intended to identify and provide the maximum number of Risk suggestions aka "weighted" HCC codes will be billed during the ACO performance years.

3.16 Senior leadership at Aledade had set internal goals for the practice oversight teams to ensure that a certain percentage of all HCC suggestions are converted to billed HCCs (on form 837 files) every quarter. The goals are monitored via "Risk viewed" and "Risk billed" App metrics. ACO performance teams were directed to keep oversight of billed HCCs that reflect in monthly the CMS CCLF ("Claim and Claim Line Feed") reporting dashboard.

3.17 For example, a dashboard example and workflow details were shared over the provider monthly call on February 19, 2021, where practices were advised to do everything they can to leverage the App suggestions from the Risk section of the Daily Huddle. The practices were also advised to adopt the Aledade suggested modified workflows that help increased uptake of weighted code suggestions.

3.18 Relator objected to the guidance on grounds identified here, and Aledade management modified the presentation for a later telecast, but never relayed the message to correct the February 19, 2021 communication to attendees.

**Teller Law**
1139 34th Ave
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

3.19    Practice Transformation Specialists ("PTSs") work with practices to leverage the risk codes that are available in the Daily Huddle App. There is a high likelihood that the PTS treats the ICD-10 code information, and the physician treats the Daily Huddle information as if they are a source of reliable data, relevant to clinical conditions of the patient, and they drive upcoding.

3.20    Several of the Aledade coding guidance materials, including Aledade App and PowerPoint presentations filled with screenshots of dashboards reflect monetary gain figures for the practice, along with HCC codes to be used. Actual diagnosis codes and their code description are used to explain to the physicians how choosing a particular weighted code is likely to bring more savings to their MSSP participation by adopting the frequent use of weighted codes that contributes to raising the risk score of their patients.

3.21    Many analytics dashboards and risk coding screenshots were also used in several high-profile physician-led meetings where the focus was how to document a patient's record, keeping in mind the diagnosis that carries high risk-weight and therefore contributes significant dollar amounts and financial gains to their practices.

3.22    Several of Aledade's C-suite, as well as ACO performance team members, including ACO directors, have referred to this as the appropriate way of communicating methodologies for maximizing the revenue and savings for Aledade, which stands to gain via revenue-sharing agreements when practices' activities result in increased shared savings in the MSSP contracts and in also results in increasing RAF score for MA plan contracts in all markets where Aledade has a presence.

3.23    Aledade has also created a shared savings distribution formula (SSDF) where the providers and practices are given incentives to maintain a high percentage of "Daily Huddle use" and "Risk view." This incentive structure reflects Aledade's philosophy that showing the practices the specific incentives to maintain high risk coding for weighted codes.

**Teller Law**
1139 34th Ave
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

3.24    Aledade has maintained the philosophy that if providers simply see these high-risk suggestions, they are likely to bill for these higher weighted categories, resulting in a higher patient risk score.

3.25    In relator's experience, and on information and belief, these activities lead to the promotion of over-coding and inappropriate amendments and other documentation activities related to diagnosis condition upcoding. Relator's in-house research shows that a greater percentage distribution of weighted codes were seen in comparison to unweighted codes for specific categories of conditions across majority of participating practices.

3.26    Aledade's materials and efforts are intended to directly or indirectly influence physicians' clinical judgment and their choice of weighted codes during the patient encounters that are likely to result in financial gains for those participating practices.

3.27    Aledade's activities herein are causing fraudulent upcoding and overbilling, including through overemphasis on physician choices of high risk HCC codes.

**C.    Aledade's focus on increasing HCC coding and billing causes fraud**

3.28    In trying to establish that patients are sicker, which is done to increase the HCC risk score, medical record documentation and billing codes play a central role. In addition to the App, Aledade has created a system of prompts and guidances for healthcare providers which result in higher risk scores.  For example, on page 23 of the Aledade "Risk Coding Toolkit section 5.b." suggested that the provider should "Code morbid obesity rather than obesity, unspecified." This is an invitation to upcode to reach an HCC goal in order to increase a patient's risk score. There are several such non-compliant coding examples throughout many of Aledade's risk coding materials.

3.29    In another example, Aledade provides 'cheat sheets' as known as "coding master sheet" or "quick reference guide" (QRG) containing a rounded Risk Adjustment Factors ("RAF") number which informs the providers exactly what situations will result in greater Hierarchical

**Teller Law**
1139 34th Ave
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

Condition Category ("HCC") codes.  The RAF score determination should be the final step in a risk adjustment coding, not a starting point for encounter documentation.  See Exh. C (Aledade CMS-HCC Coding Master sheet 2019)

3.30    Creation of the RAF "cheat sheet" for Aledade's ACO practices facilitates upcoding.

3.31    Although CMS guidelines are clear that when communicating with physicians, queries about patient encounters should include the clinical indicators, and not indicate the impact of reimbursement, multiple Aledade communications explicitly detail the economic impact and imply that routine upcoding is appropriate.  See, e.g., Exh. A (alcohol quick reference showing holiday drinks and dollar value).

3.32    Aledade produces a series of "Quick Reference" guides, e.g., Exh. B (Behavioral Health Quick Reference Guide), which identify specifically the additional HCC risk value associated with various mental health diagnoses.

3.33    At least some of these guidances are inaccurate, and will cause fraudulent upcoding if followed by the ACO practitioners.  For example, under Supplemental Tactics in page 27 of the Aledade "Risk Coding Toolkit," it is suggested that either morbid obesity or a BMI can be reported to capture an HCC.  This is untrue. According to the ICD-10-CM guidelines I.C.21.c.3): "BMI codes should only be assigned when there is an associated, reportable diagnosis (such as obesity)."  If providers, either carelessly or through improper motivation, use the HCC codes suggested by Aledade, Medicare's burden to reimburse ACOs for shared savings is increased improperly.

3.34    In summary, the Aledade system violates coding compliance rules and ignores ICD-10 coding and reporting guidelines.  Aledade "games the system" to cause the practices to report higher acuity codes through office visit claims. With supplementation from the proprietary algorithm within the Aledade App, the suggested workflows motivate the ACO practices to schedule Annual Wellness Visits ("AWV") for specific patients with the intent of documenting

**Teller Law**
1139 34th Ave
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

chronic conditions that will likely result in increasing the patient's risk score. In doing so, Aledade increases physician revenue and, at the same time, because of its relationship to the practice, Aledade's ACOs becomes eligible for shared savings as a direct result of increased risk score for the patients under ACO's management.

**D.    Minimal Risk coding, auditing, and coding compliance training focus**

3.35    Aledade intends to avoid liability for physician upcoding by maintaining distance from the medical records themselves. Chief Compliance Officer Sarah Chasson along with the ACO performance team and Chief Medical Officer Emily Maxson have asserted that there is no downside to the promotion of higher HCC risk codes through a regulatory compliance philosophy that claims participating physician providers are responsible for what they code and bill. Ms. Chasson informed the Relator on two separate occasions that Aledade believes it is not responsible for the accuracy of diagnoses codes and their substantiation in the patients' medical record associated with the office visit claims, which are submitted directly to CMS by the ACO practitioners, not by Aledade.

3.36    At the same time, Aledade, in its internal "Risk Coding and Compliance Training" module, has conveyed the message that Aledade and its staff will work with the participating practices to help them review their patients' medical records, review documentation pitfalls and help practices perform accurate HCC coding and billing.

3.37    Aledade's staff have participated in coding related activities, but frequently left the physicians to choose HCC codes based on App suggestions, and did not provide correct documentation and coding guidance. Over the years, no effort was made to ensure that inaccurate reporting is corrected in a timely manner and providers were not given any evidence-based HCC coding education to improve their documentation of chronic reportable conditions.

3.38    Recently, in March 2021, the language around medical record review support in the risk training course material was deleted and archived, and a new version with more careful

**Teller Law**
1139 34th Ave
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

messaging around risk coding related activities was introduced. The prior materials show that fraud was caused for a period of years.

3.39    Aledade's C-suite level senior leadership personnel seeks to create a fiction that it does not engage in any medical record HCC review or auditing. In private communications, however, senior leadership and other staff have indicated such activities could reveal that many practices' medical record documentation are substandard, and high weighted HCC codes may not be substantiated in the medical record. Such a circumstance would require a report to CMS and lead to a drop in risk score and loss of shared savings, and damage Aledade's revenue.

3.40    Instead of promoting coding compliance practices, or providing physician education which would improve documentation and appropriate HCC recapture, the focus of Aledade ACO performance leadership team is the promotion and billing of "weighted codes." At the same, time, Aledade did not provide sufficient certified coding education resources to the practices.

3.41    The practices that have asked for assistance with HCC risk coding and E/M level billing were informed that Aledade currently does not support medical record audit services, but that Aledade corporate will come up with additional add-on coding support to fulfill such requests in the future. Again, the philosophy is that despite promoting certain weighted risk codes, so long as Aledade leaves the specific coding to the practices themselves, risk is avoided, but in fact Aledade, by pointing out how to do it, is causing physicians to commit fraud.

**E.    Distributing incorrect guidance materials for high-value 'weighted' HCC coding**

3.42    Although Aledade upper management takes the position that no guidance is provided, in fact some PTS and other practice-facing personnel do provide direct guidance to ACOs regarding coding. In that process, coding compliance and clinical documentation basic rules and guidelines were ignored by many of the Aledade's staff who are regularly involved with the practices.

COMPLAINT AND JURY DEMAND - 11

3.43    Some among the Aledade staff have very little experience with HCC coding, and little or no experience providing appropriate documentation and coding education to providers. In many instances, the coding education that was provided to practices was not performed by any certified coding professionals and in many instances was done by PTS staff and Regional and local Medical directors (many of whom do not have certifications or significant HCC coding background or experience). These practice-facing staff simply followed their senior directors and predecessors, including passing coding material slides to each other for guidance without ensuring accuracy of the instructions they were giving to the providers and practices.

3.44    A number of the ACO practice management teams had a practice of responding to coding questions by searching the internet for information, often without using CMS-approved or accurate coding guidelines or quarterly updates. A significant amount of the coding guidance was based on assumptions, rumor, and passing on information between or among each other or other senior staff in the company. These and other teams also sought support from within the company's coding-related Slack channels which contained inaccurate guidance, but were taken as accurate by said teams due to lack of experience.

3.45    In the last several years, Aledade provided the ACO practices incorrect and non-compliant coding training, coding education materials, and HCC coding master sheets which did not have a true interpretation of the official ICD-10 coding guidelines. Through these coding materials and code specific explanations given in all coding materials published by Aledade, the staff overseeing the coding related communications conveyed to physicians and their ancillary staff how to choose weighted codes based on HCC suggestions in the Aledade App and make inferences on how to quickly apply the coding concepts, choosing HCC codes as they schedule and prepare for patients visits, and bill for the E/M visits using preferred weighted codes.

3.46    Several weighted HCC ICD-10 codes and their code descriptions were used in Aledade's materials to show and explain to physicians how to choose particular weighted codes

**Teller Law**
1139 34th Ave
Seattle, WA  98122
(206) 324-8969  Fax: 860-3172

in specific situations, using them as preferred medical diagnoses conditions, and prompting physicians to select patient diagnosis from the list of HCC codes and their descriptions and avoid using unweighted ICD-10 codes for billing. The weighted HCC code information is therefore driving physician to choose preferred medical diagnoses and code them based on the weighted ICD-10 entries, and not the other way around as it should be.

3.47 This observation was widely noted and this is almost identical to describing the ease of use of HCC codes that are made available in the ICD-10-CM codeset. The Regional Medical Directors, many of them who are practicing physicians would describe this as choosing a particular ICD-10 code as simple and easy, rather than describing the patient's condition, and its complications, physician's assessment and plan of treatment.

3.48 Certified coders and medical auditors will describe such a documentation pattern—using the ICD-10 code and its description to construct the visit documentation around the choice of diagnosis code—as an improper approach to documenting when the treating physician does not fully translate the medical decision making process at the time of the patient encounter into the medical record, leading to a mismatch between the diagnosis code billed and the documentation of that particular patient encounter on that day

3.49 Coding guidelines require that physicians describe the details of the service provided regarding a patient's condition, describe their medical judgment, the complexity of medical decision making, and the specificity of the complication caused by or associated with the medical condition. Accurate coding is done based on the documentation that is provided by the physician during the visit. Coders work with providers to code out the confirmed diagnosis, or will get clarification from the treating physician if the documentation does not specify enough details about the disease and its complication, or they will code for symptoms if the disease is not confirmed or is still under investigation (as per outpatient coding guidelines).

COMPLAINT AND JURY DEMAND - 13

3.50 Instead, Aledade's materials have suggested it is appropriate to code for conditions as if they are established when the diagnosis was inconclusive at the time of the medical visit and the condition is being investigated.

3.51 Additionally, non-compliant coding advice was given for many categories of codes e.g. coding for Morbid obesity, Alcohol and other substance use, Diabetes and its complications, mental health conditions including Depression, and others. The HCC-focused coding guidance materials developed by Aledade and its staff gave physicians and their staff easy 'tips & tricks' on how to choose and code for weighted HCC conditions instead of unweighted non-HCC diagnosis codes for a particular disease condition category. The coding materials are full of such elaborate and non-compliant HCC coding examples.

3.52 Through all-staff, field team training, other meetings, seminars, webinars, and in-person meetings with physician practices, Aledade has led the front line practicing physicians to believe that what Aledade is publishing and conveying to them is in accordance with official ICD-10 and CPT guidelines, whereas many coding compliance rules were ignored, coding rules were bent, and coding guidelines were misinterpreted, causing incorrect diagnosis coding and billing guidance to be given to the physicians and their practice staff. Aledade staff encouraged coding and billing staff to promote HCC coding within their practices with the frequent use of weighted codes and include them in their daily workflows.

**F. These activities also impact Medicare Advantage charges**

3.53 In many markets, the Aledade ACO practices also participated in value-based care arrangements with Medicare Advantage health plans. In those markets, participating practices were guided on how following Aledade's primary care practice model. The practices were promised greater success in value-based contracts as they gain in revenue and savings by increasing risk score (RAF score). Aledade explained to practice providers how among other process workflow modifications, their revenue and savings can benefit from an increased HCC

COMPLAINT AND JURY DEMAND - 14

coding, resulting in increase in patients' RAF score, which results in the increase of the Medicare Part C payments through contracts with Medicare Advantage plans which have attributed the Medicare beneficiaries to Aledade's practices. Since the value-arrangements are based on Risk score, there is a direct incentive to maintain a high-risk score by billing for higher "weighted" HCC codes instead of codes that are non-weighted.

3.54    Aledade sales staff used improper non-compliant materials to lure other new prospective independent and established practices to participate in the MSSP, and Medicare Advantage risk-sharing value-based arrangements by showing how all other practices were able to gain from the shared savings practices that Aledade has developed and by use of its ACO management platform. This led many prospective practices to believe that by joining Aledade they can also easily gain revenue and maintain high-profits by joining such value-based care-focused entity.

**G.    Promoting inappropriate documentation and billing of AWV visits**

3.55    Through the years, a high number of Annual Wellness Visits ("AWV") were scheduled and billed to increase the risk scores of the Medicare beneficiaries. The activities involved Aledade staff and practice staff creating worklists to call patients and schedule visits via Telehealth and in-person visits to increase ACO attribution and increase risk scores. Physician practices were advised to give priority to the "weighted" HCC codes to increase the Risk score capture of the patient by scheduling AWVs for that purpose.

3.56    On a regular basis, a list of high-risk patients is generated by Aledade's algorithm, which uses the probable high-risk category codes in the Aledade app. This feature enables the PTS staff to communicate to the clinic staff to schedule AWVs and bring in patients to close high-value risk care-gaps. Since the algorithm works on diagnosis probability assumptions, scheduling these visits generated revenue for the clinics, and many times add-on Evaluation and Management

**Teller Law**
1139 34th Ave
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

("E/M") visits were also billed. Many patients were reported to be not happy about the co-pay that the extra E/M visits cost to them.

3.57    In some instances, e.g., when Alcohol abuse or dependence was noted in patient's medical charts, patients have been reported to have got angry and called back physicians with their concerns about the incorrectness of the medical diagnosis that the doctor was detailing about their lifestyle and habits. Some PTSs have expressed to Relator that sometimes patients are not willing to come for such AWV as they do not feel they need it. Practice staff and PTS have informed patients that such visits are necessary for care planning, are required by Medicare and will incur no co-pay.

3.58    For promoting member attribution to a particular ACO practice, Aledade and its high-profile staff including some physician executives gave instructions to practice facing staff to suggest the practices have a Nurse Practitioner, Physician Assistant, or other qualified mid-level providers do the AWVs and bill the AWVs under National Provider Identifier ("NPI") of the main ACO physician.

3.59    The Aledade staff advised practice physicians with explanations that clearly portrayed that by doing so they were meeting the Medicare "incident to" billing requirement. Additionally, they advised, towards the end of the visit the main practice physician can either meet with the patient or come into the room briefly, e.g., "stick his/her head into the room" and sign the visit documentation to justify use of the physician's NPI.

3.60    During regular meetings with PTS team members, Relator was told that some physicians also utilized the co-visit service to bill such AWV visits, as an alternate way of billing for AWV so as to maintain the attribution of the patients to their ACO. The fact that the visit note is signed by the practice's ACO leading provider and the claim is billed under that NPI, made many practices believe and follow Aledade's expert guidance to bill for AWV and secure the patient attribution to the ACO to help increase the shared savings.

COMPLAINT AND JURY DEMAND - 16

3.61    The AWV guidance materials developed by Aledade were created to emphasize that AWVs can become high-value visits for Risk coding and the practices were informed that they can limit the documentation requirements and still bill all the important chronic HCC codes for their patients who they schedule for AWVs.    During many meetings with several Regional Medical Directors and with CMO, the Relator came to realize that Aledade has misinterpreted and/or misstated the AWV documentation requirements and ignored regulations around proper documentation of patients' active chronic conditions during the AWVs.  Multiple Aledade senior and mid-staff individuals explained to their practices their own version of the message from the corporate leadership including physician executives who lead their market groups, and this resulted in the ACO practices' and their physicians believing that they can list all possible chronic conditions from the patients' problem list, prioritize the weighted HCC codes on the AWV claim, and bill for them without actually addressing them with the patient during the AWV visit.

3.62    Aledade has been providing guidance and encouraging the AWVs due to the "shared savings incentive" created by capturing HCC risk coding during the AWVs. Over the years, Aledade's Performance team and CMO staff have frequently promoted this message by saying that the visit does not require all the components of the typical E/M visits, so all of the patient's chronic conditions codes correlating to the weighted codes from the Aledade App can be placed on the bill without much documentation in the AWV medical record. Aledade staff has repeatedly told physicians that they do not have to document all active problems that a patient has during those visits, and such AWV visits are the right opportunity to bill for all the weighted HCCs on patient's problem lists on to the AWV claim.

3.63    With the use of screening tools during AWVs, Aledade promotes the message that preventive screenings create more evidence of a weighted code, e.g., using an Alcohol screening gains incremental revenue for that service and also allow physicians to bill for F10.99, which is a weighted HCC code with little specificity around alcohol use. Clinical scenarios presented by

COMPLAINT AND JURY DEMAND - 17

1  Aledade to its ACO providers also reflect that coding for specific weighted codes can simplify

2  the use of HCC code.  This type of encouragement is present in many of the coding materials,

3  one-pagers, and power points, and they result in physicians overlooking or ignoring the clinical

4  coding compliance requirements for coding and billing for the higher weighted HCC codes.

5      3.64    In many instances, the coders and billers at the practices were guided to look up the

6  HCC coding master sheet aka "coding cheat sheets," replace the unweighted codes on patient

7  problem list with weighted codes, and bill them along with all types of patient visits, including

8  AWVs. Many practices do not have certified coders, and instead providers simply forwarded the

9  cheat sheets to their third party billing companies and asked to prioritize billing of the weighted

10  codes.

11      3.65    Recently, in March of 2021, Aledade has begun to alter the heavy emphasis reflected

12  above, however, nothing is being done to correct the problems created in past years.  Instead

13  Aledade is emphasizing that nothing was done wrong or messaged wrong previously, and that

14  prior communications followed CMS guidance—there were merely some grey areas previously.

15  Many of the previously developed coding materials, power-points, 1-pagers, and other coding

16  collateral were archived.

17  **H.    Additional Examples of Inappropriate Diagnosis Coding and Workflow Guidance**

18      3.66    Aledade materials provided incorrect diagnosis coding and billing guidance in many

19  instances.  For example, the guidance document titled "Coder's Corner - Frequently Missed" says

20  – "Are you holding claims awaiting completion of a note or identification of the proper diagnosis

21  code? Typically, this should be done and addressed with the physician and/or provider within 48-

22  72 hours while the exam is still fresh in your mind. The physician and/or provider should be able

23  to answer the question in a timely manner and you should identify the best way of communication

24  via EHR or in person. Also, it is not advised to hold claims for confirmation of a diagnosis, based

25  on findings from labs or diagnostic testing."

COMPLAINT AND JURY DEMAND - 18

3.67 This above-mentioned guidance likely led physicians to send in claims with an incomplete or unconfirmed diagnosis. As per section IV of the ICD-10 coding guidelines and the CMS claims integrity manual, the physicians' practices are required to send in claims certifying the reason of visit, indicating the medical necessity along with any confirmed diagnosis that was a part of the medical decision-making process on the day of the patient visit. The physicians are required to maintain a record of what was addressed/evaluated/confirmed and documented during the visit. Suspected or probable diagnoses are never coded as confirmed diagnoses as per outpatient coding guidelines. Aledade's messaging most likely caused significant overbilling of unconfirmed diagnoses as it continued to promote the billing of weighted HCC codes

3.68 For many E/M services (office visits) including CCM (chronic care management) visits, the Aledade PTS and the billers/coders at the practices were advised to include all possible and matching weighted HCC codes on the CCM claims. Many process shortcuts and customized workflows were created to convert the non-weighted codes to weighted HCC codes in the patients' chart and add these specific target HCC codes to the patient problem lists.

3.69 This above was revealed to the Relator by a senior PTS staff member who explicitly revealed that several clinic staff were doing this under a blank permission rule from the practice physician who would trust them with making diagnoses code entries to a patient's medical record in the EHR. In such scenarios, the physicians responsible for those patient records were assuming that such alteration of medical records is appropriate for clinic staff, and choosing better-weighted codes as per Aledade's guidance complies with regulatory requirements. In many small to medium size provider owned practices, the physician spouse is the office manager and the main person responsible for supervising or managing workflows involving medical records, coding, and billing.

3.70 This results in incomplete or inaccurate records. The treating physician (or non-physician practitioner) would need to add the appropriate medical diagnosis and its corresponding

COMPLAINT AND JURY DEMAND - 19

**Teller Law**
1139 34th Ave
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

ICD-10 code, *if* it meets the criteria of accurate coding and documentation as per the treating physician's own medical judgement. Adding a diagnosis made by anyone except by the treating physician would be an improper amendment or alteration of the medical record and, if done inappropriately, violates many provisions that protect the authenticity of patients' medical records.

3.71    Many practices are still following Aledade's coding and billing guidelines, and continue to send incorrect patient diagnosis data and bill Medicare for all these types of E/M visits. Many times coders and billers at these practices interpreted lab values to conclude diagnosis codes and also led the provider to choose the higher weighted code in a non-compliant way. It is known company-wide at Aledade that the coders and billers at the practices look up the Aledade HCC coding master sheets and use the preferred weighted codes and bill them along with all types of visits including AWVs. Many other practices do not have certified coders and simply follow Aledade's coding guidances.

3.72    The PTS, coder, and billers within a practice group typically suggest to physicians the ICD-10 codes from the daily huddle app that are closely matched to a patient's disease profile. This easily leads to over-billing and over-coding of higher weighted HCC codes. Most of these conversations have been reported to have been conducted in a non-compliant way, e.g., leading the provider to consider a specific weighted HCC code from the HCC suggestions pool in the daily huddle App, resulting in better "Risk resolved" and "Risk billed" metrics, that in turns lead to more physician incentives through SSDF and an increase shared savings.

3.73    Such Aledade resources titled, "Risk_Optimization_Checklist_final_version", "Aledade KS Missed HCC Opportunities Guide 2017-11 (1)", and "Aledade KS Missed HCC Opportunities Guide 2017-11 (1)", "Coder's Corner_ Coding and Billing Tips One Pager 3.12.19" and many others depict that the central theme is to promote HCC coding through creative workflows.

COMPLAINT AND JURY DEMAND - 20

3.74    Such faulty claim submissions with incorrect diagnoses coding data were submitted by practices for several years and this resulted in increased risk score, contributing to ACO shared savings (as determined by CMS) and also caused an undue burden to Medicare. It has also led to false high patient risk "RAF" score reporting for the Medicare beneficiaries under the Medicare Advantage plans.

3.75    Sub-standard incorrect diagnosis coding data has led to overutilization of services, over-payments and has been the center of fraud, waste, and abuse related to HCC coding for many years.

## I.    Resubmission of prior adjudicated claims to enhance risk scores

3.76    In 2020 (and likely for other prior years), Aledade advised some of its participating ACO practices to re-submit claims after the MSSP contract period was over. This re-billing of claims activities was led by some senior members of the Aledade's ACO performance team and other ACO Directors.  They worked with and instructed the practice-facing staff to convey reports and direct many ACO practices to resubmit the claims with weighted HCC codes that were not found to be matching the year-end CCLF data. This was done for the claims that were within the 1-year timely filing period so as not to lose the opportunity to submit HCC codes to ensure high patient risk scores that could be gained from re-submitting the claims with additional weighted HCC codes.

3.77    Aledade staff or any other certified risk adjustment coders did not do a review of medical records to ensure that the diagnoses codes which were submitted were appropriately substantiated in the medical records for those dates of service claims. All efforts were put towards increasing the number of HCC codes leading to probable upcoding for HCC diagnosis.

3.78    In many instances, Aledade and practice staff worked together to alter/amend the medical records by adding or modifying the diagnoses codes, added/altered ICD-10 codes on new or previously billed claims, added new coding diagnoses to reflect patient missed chronic

COMPLAINT AND JURY DEMAND - 21

Teller Law
1139 34th Ave
Seattle, WA  98122
(206) 324-8969   Fax: 860-3172

conditions, and re-submitted the claims for past dates of service. This was done to meet the high 'Risk score' requirement for the practice's patients and to ensure that the practice makes it to the high shared savings as per the ACO MSSP contract.

3.79    Aledade's ACO Executive Director Jeff Mandel informed Relator that this was purposely done to maintain high-risk scores, and maximize the shared savings for certain practices that were on the verge of losing the shared savings in the MSSP contract.

3.80    In his research of the claims data, and based on conversations with his colleagues at Aledade, Relator concludes that a large percentage of the claims submitted do not reflect the true and accurate picture of the patients' active chronic conditions at the time. While, over the years, substantial efforts were made to increase the risk score of the patients by adding all possible weighted HCC codes to the office visit claims, Aledade and many of its ACO practices did not make any reasonable efforts to ensure the accuracy of the HCC codes billed on these office claims, or correct the claims where inaccuracies were found during record reviews. The clinical validation aspect of many of the HCC codes that were billed was largely ignored.

## J.    Intentional Scheme or Plan

3.81    Aledade is responsible for the actions of its employees which were taken for its benefit.

3.82    Aledade's actions are a substantial factor in producing foreseeable false claims.

3.83    As a result of the above, Aledade and numerous ACOs have been paid in violation of Medicare certifications.

3.84    As referenced above, Medicare funds are paid to Aledade and its participating ACOs in much higher amounts than if accurate guidance had been given to the providers who participate in the Aledade ACO system.

3.85    The purpose of the above-referenced scheme was to obtain government money for Aledade and its ACOs to which it was otherwise not entitled.

COMPLAINT AND JURY DEMAND - 22

3.86    Defendants, acting through their agents or employees, knowingly took the actions identified herein, which foreseeably caused to be presented to an officer or employee of the United States Government, false or fraudulent claims for payment or approval.

3.87    Defendants, acting through their agents or employees, including ACOs of which it is a part, knowingly caused a false record or statement to be made and/or used in order to get a false or fraudulent claim paid or approved by the Government.

3.88    Defendants, acting through their agents or employees, conspired to defraud the Government by getting a false or fraudulent claim allowed or paid.

3.89    Defendants made these false representations of material fact knowingly as that term is defined in 31 U.S.C. § 3729(b).

3.90    The false representations were believed by the government and acted upon by the government to its damage.

3.91    These practices resulted in higher billing for services than were legally allowed, and resulted in Aledade and its ACOs receiving more money than they were entitled to because of the knowingly fraudulent actions of its employees and agents.

3.92    These fraudulent practices have been ongoing and continuing for a period of years.

## IV.  CLAIMS OF THE UNITED STATES

4.1    The facts stated above give rise to a violation of the Federal False Claims Act, 31 U.S.C. 3729(a)(1)(2)(3).

4.2    The defendants are liable for the actions of their agents, and their employees under the doctrine of Respondeat Superior.

## V.  DAMAGES SUFFERED BY THE UNITED STATES

5.1    As a proximate cause of the fraudulent practices described above the United States of America has suffered damages in amounts fraudulently billed to the United States.

**Teller Law**
1139 34th Ave
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

## VI. PRAYER FOR RELIEF

**WHEREFORE** plaintiff prays for damages as follows on behalf of the United States, and/or on his own behalf as appropriate:

**On behalf of the United States:**

8.1    Economic damages in an amount to be proven at time of trial.

8.2    A civil penalty in the maximum amount allowed by law.

8.3    Treble damages as provided for in 31 U.S.C. §3729(a).

8.4    Prejudgment interest.

8.5    Reasonable attorney fees and costs.

8.6    Whatever additional damages the court shall deem to be just and equitable.

## VII. JURY DEMAND

Relator hereby demands a jury.

DATED this 25th day of March, 2021.

Stephen A. Teller, WSBA #23372
Attorney for Relator Singh

**Teller Law**
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172