FILED (DROP BOX)

MAY 24 2022

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

UNITED STATES OF AMERICA, ex rel.
KHUSHWINDER SINGH

Plaintiff-Relator

v.

ALEDADE, INC. AND RELATED
ENTITIES; ANDOVER FAMILY
MEDICINE, L.L.C.; DR. BESHARA
HELOU D/B/A GEORGETOWN
MEDICAL ASSOCIATES; CLINTON
MEDICAL CLINIC INC.; COASTAL
CAROLINA INTERNAL MEDICINE,
PA; DELAWARE PRIMARY CARE
LLC; DUNBAR MEDICAL
ASSOCIATES, PLLC; FAMILY
PRACTICE ASSOCIATES PA;
GASTON MEDICAL ASSOCIATES,
P.A.; MED FIRST IMMEDIATE CARE
AND FAMILY PRACTICE, P.A.; MID-
ATLANTIC FAMILY PRACTICE LLC;
NATCHITOCHES MEDICAL

**Civil Action No. 21-cv-0410-
JHC**

**FILED UNDER SEAL
pursuant to
31 U.S.C. §3730(b)(2)**

**FIRST AMENDED
COMPLAINT**

**Jury Trial Requested**

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

SPECIALISTS, LLC; POST ROCK
FAMILY MEDICINE; PRIMARY
CARE OF DELAWARE, LLC;
STONEY BATTER FAMILY
MEDICINE ASSOCIATES, P.A.;
SUSSEX INTERNAL MEDICINE LLC;
STONECREEK FAMILY PHYSICIANS
LLP; VALLEY INTERNAL
MEDICINE, INC.; WALNUT BOTTOM
FAMILY PRACTICE, LLC;
WILLIAMSON HEALTH &
WELLNESS CENTER, INC.;
AND OTHER DOE ALEDADE
PROVIDERS

Defendants.

## FIRST AMENDED COMPLAINT

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

## Table of Contents

I.    STATEMENT OF THE CASE ........................................................ 2

II.   LEGAL FRAMEWORK ............................................................. 7

    A.    Parties ........................................................................... 7

    B.    Time Period .................................................................. 15

    C.    Jurisdiction and Venue ................................................. 15

    D.    The False Claims Act ................................................... 15

    E.    Purpose of This Amendment ........................................ 17

III.  BACKGROUND ..................................................................... 18

    A.    Medicare Advantage ..................................................... 18

        1.    MA Organizations and MA Plans ..................... 19

        2.    MSSP ................................................................ 26

    B.    Aledade Contracts with MAOs ..................................... 28

        1.    Aledade ACOs .................................................. 29

        2.    Aledade's Providers' and Aledade LLCs' Contracts with MA Organizations ........................................................ 31

        3.    Aledade's Responsibilities Under Medicare Advantage ........ 35

IV.  THE FRAUD SCHEME ........................................................... 43

    A.    The "Gravy Sitting in the Chart"—Exploiting Medicare Advantage 43

        1.    Causing Providers to Submit Falsified Diagnoses to MA Plans ................................................................. 48

            a.    Instructing Providers to Use Annual Wellness and Chronic Care Management Visits to Falsify High Value Diagnoses .................... 48

            b.    "Aledade Gospel": Instructing Providers to Falsely Diagnose "the 5 Ds"— High Value Diagnoses ............. 55

                i.    Diet of Donuts = Obesity ....................... 57

                ii.    Depression ............................................. 60

                iii.    Diabetes with Complications ................... 62

i

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

           iv.     Drinking and Drugs.................................................. 64

    2.    Programming the Aledade App to Fraudulently Default to High Value Diagnoses.......................................................... 70

    3.    Use of Retrospective Chart Reviews to Falsely Add High Value Diagnoses ................................................................. 75

B.    Conspiring with Defendant Providers to Co-Promote Fraudulent Coding Practices ..................................................................... 78

C.    "No Diagnosis Left Behind": Management Did Whatever It Took to Increase High Value Diagnoses .......................................... 82

D.    Gaming MSSP ............................................................... 88

V.    MATERIALITY ........................................................... 90

VI.    UNLAWFUL RETALIATION ...................................... 97

VII.    COUNTS............................................................................ 100

VIII.    JURY DEMAND .............................................................. 107

ii

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

This is a False Claims Act *qui tam* action by Relator to recover treble damages and civil penalties arising from the actions of Defendant Aledade, Inc. (and related entities) ("Aledade") and its primary care providers with whom it contracts, including at least the providers named in this Complaint ("Defendant Providers"); and any other Aledade primary care providers ("Providers" or "Aledade Providers") not named in this Complaint who are engaging in the conduct alleged in this Complaint. Defendant Providers are located or headquartered in Delaware, Kansas, Louisiana, North Carolina, Pennsylvania or West Virginia: Dr. Beshara Helou d/b/a Georgetown Medical Associates (Georgetown, DE); Delaware Primary Care LLC (Dover, DE); Family Practice Associates PA (Wilmington, DE); Mid-Atlantic Family Practice LLC (Lewes, DE); Primary Care of Delaware, LLC (Dover, DE); Stoney Batter Family Medicine Associates, P.A. (Wilmington, DE); Sussex Internal Medicine LLC (Milford, DE); Andover Family Medicine, L.L.C. (Andover, KS); Post Rock Family Medicine (Plainville, Stockton, and Palco, KS); Stonecreek Family Physicians LLP (Manhattan, KS); Natchitoches Medical Specialists, LLC (Natchitoches, LA); Clinton Medical Clinic Inc. (Clinton, NC); Coastal Carolina Internal Medicine, PA (Jacksonville, NC); Gaston Medical Associates, P.A. (Gastonia, NC); Med First Immediate Care and Family Practice, P.A. (Raleigh,

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

NC); Valley Internal Medicine, Inc. (Fayetteville, NC); Dunbar Medical Associates, PLLC (Dunbar, WV); Williamson Health & Wellness Center, Inc. (Williamson, WV); and Walnut Bottom Family Practice, LLC (Mount Holly Springs, PA).

## I.   STATEMENT OF THE CASE

1.     Aledade is a participant in Medicare Advantage (MA) (Medicare Part C), Affordable Care Act (ACA), and Medicare Shared Savings Program (MSSP). Aledade owns and operates several Accountable Care Organizations, which are comprised of independent primary care providers (Aledade Providers) that wish to participate in Medicare Advantage and other Medicare programs.

2.     Medicare Advantage provides Medicare patients the option to enroll in a private insurance plan. Congress primarily created this program as a cost-saving measure for the taxpayer-funded program.

3.     The program insures patients through MA Plans differently than it does with traditional Medicare. Medicare pays MA Organizations a capitated or fixed amount for each patient according to a formula. The capitated rate is set by a complex formula that lies at the heart of the allegations in this

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

Complaint. The MA Organization submits a bid to Medicare containing data and information that is compared to an administratively set benchmark.

4.    Recognizing that the cost of care will vary for each patient, the fixed amount for each patient varies according to the patient's demographic factors such as age and gender, and health status-based diagnoses codes. Each patient is assigned a risk adjustment score. Generally, higher capitated rates are paid for sicker patients and lower capitated rates for healthier patients. This risk adjustment model utilizes Hierarchical Conditions Categories (HCC), which represent the medical component of the patient's risk adjustment score. Only life-altering, severe, acute, or chronic medical conditions are given risk adjusting weight that leads to higher payments to the MA Plans. There are selective diagnoses that are considered **high value HCC diagnoses** that generate even larger capitated payments.

5.    Aledade recognized that Medicare Advantage created opportunities to "game" this risk adjustment system. Aledade exploited these opportunities.

6.    Aledade did whatever it took to make patients appear sicker than they were. Sicker-appearing patients who did not actually require more

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

services made Aledade more money. So, Aledade manipulated **high value HCC diagnoses** to attach higher risk scores for Medicare patients.

7. Its scheme worked like this. Aledade instructed its Providers to schedule Medicare patients for Annual Wellness Visits (AWVs) and Chronic Care Management (CCM) visits as vehicles to diagnosis patients with **high value HCC diagnoses**.

8. Aledade knowingly produced faulty coding guidance such as cheat sheets, PowerPoints, and other coding reference materials to guide Aledade Providers to use selective **high value HCC diagnoses** when submitting claims to Medicare and MA Plans.

9. Aledade fraudulently instructed Aledade Providers to diagnose "the 5 Ds" because these were **high value HCC diagnoses**:

- Diabetes with Complications
- Depression
- Diet of Donuts = Obesity
- Drinking = Alcohol Use/Abuse/Dependence
- Drugs = Drug Use/Abuse/Dependence

10. This fraudulent coding guidance was known as "**Aledade gospel.**"

4

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

11.     Aledade fraudulently programmed its software application (the Aledade App) to default to these **high value HCC diagnoses**, to be shown to Aledade Providers as diagnoses coding opportunities.  The App was rigged.

12.     If any of these pressure tactics did not lead to the assignment of **high value HCC diagnoses**, Aledade employed a fail-safe.  It used retrospective chart reviews to pressure its Providers to add the **high value HCC diagnoses** to patients' medical records.

13.     Aledade called these high value diagnoses the "**gravy sitting in the chart**."

14.     Some Aledade Providers were unwitting participants while others were complicit.  Those alleged to be complicit are named in this Complaint, including "Doe" Aledade Providers.

15.     The alleged conduct usurped medical judgment and was done solely to make more money for Aledade and Defendant Providers.

16.     Aledade's focus on risk adjustment was singular.  Under one initiative called "**No Diagnosis Left Behind**," it generated reports to monitor and manipulate Provider's risk adjustment metrics.

5

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

17.     Aledade leadership at the very top of the organization and Aledade Medical Directors masterminded and directed the fraudulent practices alleged in this Complaint.

18.     Through its fraudulent course of conduct, Defendants knowingly submitted or caused the submission of thousands of false or fraudulent claims to the Government, in violation of the False Claims Acts, and the Government paid those claims.

19.     The United States and the taxpayers have been victimized financially by the alleged fraud scheme.  Medicare expects and requires that claims are paid for healthcare services for patients that are based on accurate and truthful diagnoses.  The Medicare program's requirement for complete, accurate and truthful reporting of patient diagnoses (ICD codes) goes directly to the "essence of the bargain" with participants in Medicare Advantage.  Diagnoses directly affect payment; their accuracy is material to the Medicare program's decision to make payments to its MA Organizations (which are then paid to first tier and downstream entities like Defendants).

20.     Patients—Medicare beneficiaries—are also victims of the alleged fraud scheme.  Inaccurate or false diagnoses (ICD codes) can also have serious

6

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

negative impact on patient health and safety, which makes the conduct alleged in this case particularly troubling.

21. The False Claims Act is the appropriate tool to remedy this fraudulent scheme according to statements earlier this year by the Deputy Assistant Attorney General for the United States Department of Justice:

> Another important priority for the department has been investigating and litigating a growing number of matters related to the Medicare Advantage program …The department has pursued plans and healthcare providers that manipulated the risk adjustment process by submitting unsupported diagnosis codes to make their patients appear sicker than they actually were.

https://www.justice.gov/opa/pr/justice-department-s-false-claims-act-settlements-and-judgments-exceed-56-billion-fiscal-year

## II. LEGAL FRAMEWORK

### A. Parties

22. Relator alleges, based upon personal knowledge, relevant documents, and information, and on information and belief, the facts set forth in this Complaint.

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

23.     Relator has extensive first-hand knowledge of Defendants' pattern and practice alleged in the Complaint based on Relator's employment at Defendant Aledade, Inc., while residing in Seattle, Washington.

24.     Relator was retaliated against for raising, objecting to, and opposing fraudulent conduct alleged in this Complaint.

25.     Relator has standing to bring this action pursuant to 31 U.S.C. § 3730(b)(l). Relator is entitled to either between 15-25 percent of the proceeds that result from this action, or any settlement of the claims raised or identified in this complaint, under 31 U.S.C. § 3730(d)(1); or between 25-35 percent of the proceeds pursuant to 31 U.S.C. § 3730(d)(2).

26.     Pursuant to subsection (e)(4)(A) of 31 U.S.C. § 3730, Relator voluntarily disclosed to the Government the information on which the allegations or transactions in the claims are based; and Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions that may exist and has voluntarily provided the information to the Government before filing an action under this section. 31 U.S.C. § 3730(e)(4)(A). Relator is the original source of these allegations as defined in 31 U.S.C. § 3730(e)(4)(B).

8

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

27.     Relator has complied with all procedural requirements of the laws under which this Complaint is brought.

28.     Defendant Aledade, Inc. is a Delaware corporation headquartered in Bethesda, Maryland. It transacts business in Seattle, Washington, within the Western District of Washington, as well as other states of the United States of America. https://www.aledade.com/; https://www.aledade.com/washington

29.     Aledade owns and operates several Limited Liability Corporations (LLCs) for the purpose of operating Accountable Care Organizations (ACOs) and providing administrative support to Aledade Providers. Aledade's ACOs are comprised of independent primary care providers within a geographic region that want to participate in commercial contracts or Government savings programs. Aledade is engaged in the business of contracting with healthcare providers to improve their revenue. https://www.aledade.com/our-solutions

30.     Aledade, Inc. and its related corporate entities (including but not limited to a series of LLCs using the Aledade name which are incorporated in Delaware) are collectively referred to in this Complaint as "Aledade."

31.     Aledade describes itself on its website this way:

Since our founding, Aledade has grown rapidly, partnering with more providers and covering more patients. We

9

currently operate ACOs across 40+ states in partnership with more than 800 primary care practices, including over 100 federally-qualified health centers. Through this nationwide network, Aledade practices manage roughly $12 billion in healthcare spending through 35 Medicare and 51 other value-based contracts and provide care for nearly 1.7 million patients. Since our founding, we have raised $306 million in funding and now employ a staff of over 400 experts (and growing) in health policy, technology, and practice transformation. This growth is driven by primary care physicians across the country eager to make the shift to value-based care to deliver better care at a lower cost.

https://www.aledade.com/our-company

32.     Aledade operates ACOs that include hundreds of primary care providers, including the Providers explicitly named as Defendants in this Complaint or named as "Doe" Defendants (Defendant Providers). The explicitly identified Defendant Providers are located or headquartered in six states— Delaware, Kansas, Louisiana, North Carolina, Pennsylvania and West Virginia.

10

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

33.     The below Defendant Providers are located or headquartered in Delaware.

34.     Defendant Dr. Beshara Helou d/b/a Georgetown Medical Associates is an internal medicine provider in Georgetown, Delaware. http://www.gmamd.com; https://www.healthgrades.com/physician/dr-beshara-helou-xbt7 d

35.     Defendant Delaware Primary Care LLC is a primary care provider in Dover, Delaware with an additional office in Milford, Delaware. https://mydeldoc.com/

36.     Defendant Family Practice Associates PA is a healthcare provider in Wilmington, Delaware. https://fpade.org/

37.     Defendant Mid-Atlantic Family Practice LLC is a primary care provider in Lewes, Delaware. https://www.mafp.net/

38.     Defendant Primary Care of Delaware LLC is a primary care provider affiliated with and located at the Eden Hill Medical Center in Dover, Delaware. The Eden Hill Medical Center is a large medical center with 17 healthcare provider offices in Dover, Delaware. https://www.edenhillmedicalcenter.com/primary-care-of-delaware-2/; https://www.edenhillmedicalcenter.com/about-us/; https://www.edenhillmedicalcenter.com/

11

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

39.     Defendant Stoney Batter Family Medicine Associates, P.A. is a full-service healthcare provider offering primary care services in Wilmington, Delaware. http://www.stoneybatterfamilymedicine.com/

40.     Defendant Sussex Internal Medicine LLC is a geriatric and internal medicine healthcare provider affiliated with the Beebe Medical Center in Milford, Delaware. Beebe Medical Center, Inc. is a large healthcare provider in Lewes, Delaware with several outpatient offices in locations across Sussex County, Delaware. https://www.beebehealthcare.org/doctors/manu-sehgal-md; https://www.beebehealthcare.org/locations/sussex-internal-medicine-llc

41.     The below Defendant Providers are located or headquartered in Kansas.

42.     Defendant Andover Family Medicine, L.L.C. is a primary care provider located in Andover, Kansas. https://andoverfamilymed.com/

43.     Defendant Post Rock Family Medicine is a healthcare provider composed of five separate practices, with clinics located in Plainville, Kansas, Stockton, Kansas, and Palco, Kansas. The five providers include Daniel J. Sanchez, MD, PA; Jennifer Maciaszek, MD; Prairie Star Family Practice, PA; Rooks County Health Center; and Solomon Valley Family Medicine, PA. https://www.postrock.us/

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

44.     Defendant Stonecreek Family Physicians is a primary care provider in Manhattan, Kansas. https://www.stonecreekfp.com/

45.     The below Defendant Providers are located or headquartered in Louisiana.

46.     Defendant Natchitoches Medical Specialists, LLC is a healthcare provider in Natchitoches, Louisiana. https://www.natchitocheschamber.com/list/member/natchitoches-medical-specialists-natchitoches-2842

47.     The below Defendant Providers are located or headquartered in North Carolina.

48.     Defendant Clinton Medical Clinic Inc. is a primary care provider in Clinton, North Carolina. http://www.clinton-med.com/

49.     Defendant Coastal Carolina Internal Medicine, PA is a healthcare provider offering primary care and internal medicine services in Jacksonville, North Carolina. https://www.ccimpa.com/

50.     Defendant Gaston Medical Associates, P.A. is a multi-specialty healthcare provider in Gastonia, North Carolina. https://www.gastonmedical.com/

51.     Defendant Med First Immediate Care and Family Practice, P.A. ("Med First") provides primary and urgent care services in 20 rural locations

13

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

throughout North Carolina and South Carolina. Med First is headquartered in Raleigh, North Carolina. https://www.thinkmedfirst.com/

52. Defendant Valley Internal Medicine, Inc. is a primary care and internal medicine provider in Fayetteville, North Carolina. https://www.valleyinternalmedicine.com/

53. The below Defendant Providers are located or headquartered in Pennsylvania.

54. Defendant Walnut Bottom Family Practice, LLC is a healthcare provider in Mount Holly Springs, Pennsylvania. https://walnut-bottom-family-practice.business.site/

55. The below Defendant Providers are located or headquartered in West Virginia.

56. Defendant Dunbar Medical Associates, PLLC is a healthcare provider with offices in Dunbar, West Virginia and Hurricane, West Virginia. https://www.dmawv.com/

57. Defendant Williamson Health & Wellness Center, Inc. is a healthcare provider with locations in Williamson, West Virginia and Gilbert, West Virginia. https://williamsonhealthwellness.com/

14

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

**B.  Time Period**

58.     On information and belief, the conduct alleged in this Complaint has been occurring since Aledade's founding in 2014 and is continuing.

**C.  Jurisdiction and Venue**

59.     This Court has subject matter jurisdiction over the claims asserted in this Complaint, pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and 28 U.S.C. § 1331.

60.     Venue is proper in this judicial district, pursuant to 31 U.S.C. §§ 3732(a) and 28 U.S.C. 1391(b) and (c), because one or more defendants may be found, resides, and/or transacts business in this District, or because an act, proscribed by 31 U.S.C. § 3729, occurred in this District.

**D.  The False Claims Act**

61.     The False Claims Act provides, in part: Liability for Certain Acts.
— (1) In general. —[ ] any person who—

    (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval

    (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim

    (C) conspires to commit a violation of subparagraph (A), (B), [ ] or (G), [ ]

15

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

(G) knowingly makes, uses, or causes to be made or used, a false

record or statement material to an obligation to pay or transmit money or

property to the Government, or knowingly conceals or knowingly and

improperly avoids or decreases an obligation to pay or transmit money or

property to the Government, [ ]

is liable to the United States Government for a civil penalty of not less than $5,000

and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation

Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3

times the amount of damages which the Government sustains because of the act of

that person. 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

62.     Under the False Claims Act, scienter must be demonstrated:

Definitions— For purposes of this section— (1) the terms "knowing" and

"knowingly"— (A) mean that a person, with respect to information— (i) has actual

knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity

of the information; or (iii) acts in reckless disregard of the truth or falsity of the

information; and (B) require no proof of specific intent to defraud. 31 U.S.C. §

3729(b)(1)-(2).

63.     Under section (b)(2) the term "claim" — (A) means any request or

demand, whether under a contract or otherwise, for money or property and whether

16

**FIRST AMENDED COMPLAINT**
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

or not the United States has title to the money or property, that— (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government— (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; [ ]. 31 U.S.C. § 3729(b)(1)-(2).

### E.   Purpose of This Amendment

64.   This Complaint was amended to further explain the allegations in the original Complaint under section. III. F (p. 14-15), as repeated here.

65.   In many markets, the Aledade ACO practices also participated in value-based care arrangements with Medicare Advantage health plans. In those markets, participating practices were guided on how following Aledade's primary care practice model. The practices were promised greater success in value-based contracts as they gain in revenue and savings by increasing risk score (RAF score). Aledade explained to practice providers how among other process workflow modifications, their revenue and savings can benefit from an increased HCC coding, resulting in increase in patients' RAF score, which results in an increase of

17

the Medicare Part C payments through contracts with Medicare Advantage plans which have attributed the Medicare beneficiaries to Aledade's practices. Since the value-arrangements are based on Risk score, there is a direct incentive to maintain a high-risk score by billing for higher "weighted" HCC codes instead of codes that are non-weighted.

66.     Aledade sales staff used improper non-compliant materials to lure other new prospective independent and established practices to participate in the MSSP, and Medicare Advantage risk-sharing value-based arrangements by showing how all other practices were able to gain from the shared savings practices that Aledade has developed and by use of its ACO management platform. This led many prospective practices to believe that by joining Aledade they can also easily gain revenue and maintain high-profits by joining such value-based care-focused entity.

## III.    BACKGROUND

### A.    Medicare Advantage

67.     Medicare is a federally operated health insurance program administered by the Centers for Medicare and Medicaid Services ("CMS") benefitting individuals 65 and older and the disabled.  42 U.S.C. § 1395c, et seq.

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

68.     There are four parts to the Medicare program: Part A covers inpatient care (hospital insurance), Part B covers outpatient care (medical insurance), Part C is Medicare Advantage at issue in this case, and Part D is prescription drug coverage.

69.     A patient-beneficiary who is eligible for Medicare may choose to be covered under what is commonly referred to as "traditional" Medicare, which is Medicare Parts A and B, in which CMS reimburses healthcare providers for services rendered through the direct submissions of claims.  This is known as a fee-for-service payment system. Certain Medicare insurance savings programs, such as the Medicare Shared Savings Program (MSSP), involve the fee-for-service payment system under "traditional" Medicare.

70.     Under Part C, Medicare Advantage, Medicare patients may opt out of "traditional" Medicare and instead may enroll as a Medicare patient in a private insurance plan known as a Medicare Advantage Plan ("MA Plan") managed by a private insurance company ("MA Organization or MAO").  42 U.S.C. §§ 1395w-21 to 1395w-28.

### 1.  MA Organizations and MA Plans

71.     The Medicare Program insures patients through MA Plans differently than it does with traditional Medicare.  Medicare pays MA Organizations a

19

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

capitated or fixed amount for each patient according to a formula. This fixed

amount covers Medicare Part A (hospital insurance) and Part B (medical

insurance) benefits for the patient. The capitated rate is set by a complex formula

that lies at the heart of the allegations in this Complaint.

72. The MA Organization submits a bid to Medicare containing data and

information that is compared to an administratively set benchmark. 42 U.S.C. §§

1395w-23(a)(1)(B) and 42 C.F.R. § 422.304.

73. Recognizing that the cost of care will vary for each patient, the

Medicare program adjusts the fixed amount for each patient enrolled in a Medicare

Advantage plan based on a methodology that accounts for various factors,

including the patient's (1) demographic factors such as age and gender, and (2)

health status-based diagnoses codes. 42 U.S.C. § 1395w-23(a)(1)(C).

74. This adjustment based upon individual patient factors is referred to as

a risk adjustment, and each patient is assigned a risk adjustment score ("risk

adjustment score," "risk adjustment factor" or "RAF Score") so that CMS can

determine patients' future medical needs for the next year. The risk adjustment

score acts as a multiplier that is applied to the MA Organization's bid for covering

Medicare Part A (hospital insurance) and B (medical insurance) services to

determine the appropriate capitated payment. This risk adjustment score can result

20

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

in higher capitated rates for sicker patients and lower capitated rates for healthier patients, the logic being that sicker patients will cost the Medicare program more in necessary services while healthier patients should cost the Medicare program less. 42 U.S.C. § 1395w-23(a)(1)(G) and 42 C.F.R. § 422.308(e).

75.     More specifically, the Medicare program's risk adjustment model utilizes Hierarchical Condition Categories ("HCC"), which represent the medical component of the patient's risk adjustment score. 42 C.F.R. § 422.2.

76.     Only life-altering, severe, or chronic medical conditions are given risk adjusting weight such that MA Plans should receive larger capitated payments for that patient because those conditions may require greater medical services (and a greater amount of money in the pool). Accordingly, not every diagnosis correlates with an HCC that affects the risk adjustment score under the Medicare program. Further, there are an even a smaller number of risk adjusting diagnoses that are considered "high value" HCC diagnoses that generate even larger capitated payments ("high value HCC diagnoses"), and it is those diagnoses that are at issue here.

77.     The HCC model is prospective, meaning it relies on risk adjusting diagnoses codes from dates of service by a provider in a prior year (the "date of service year") to determine payments in the following year (the "payment year").

21

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

Each patient's risk adjustment score is calculated anew for the following year. The higher a patient's risk adjustment score (RAF Score), the higher the Medicare payments to the MA Organization.

78.     This simple diagram below describes what goes into the Medicare program's risk adjusted "HCC" model.



79.     The diagnoses codes mapped into HCCs are referred to as "risk adjusting diagnoses codes." Related groups of diagnoses are ranked on the basis of disease severity and the cost associated with their treatment. If a person has more than one condition within a certain category, only the highest (most severe) will be assigned an HCC for calculating the risk score.

22

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

80.     The International Statistical Classification of Diseases and Related Health Problems ("ICD") sets forth the standards accepted by the Medicare program and the healthcare industry for the identification of diagnoses codes for health conditions by providers. 45 C.F.R. § 162.1002(a)(1)(i), (b)(1), (c)(2)(i) and 42 C.F.R. § 422.310(d)(1)

81.     ICD codes are alphanumeric (letter and number) codes used by healthcare providers, insurance companies and public health agencies to represent diagnoses; every disease, injury, infection and symptom has its own code. The applicable standards for ICD diagnoses codes after October 1, 2015, are set forth in the International Classification of Diseases, Tenth Revision, Clinical Modification ("ICD-10").

82.     ICD codes are a determinative factor in the calculation of risk adjustment payments based on a patient's health status. As alleged in this Complaint, Aledade caused the submission of false or fraudulent ICD diagnoses codes by Aledade Providers to fraudulently inflate RAF Scores and subsequent capitated payments from the Medicare program.

83.     There are tens of thousands of ICD-10 codes that map to one or more of the 86 HCC codes that affect Medicare payment in the CMS-HCC Risk Adjustment Model. A code can map to more than one HCC as ICD-10 contains

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

combination codes (i.e., one code can represent two diagnoses or a diagnosis with a complication or disease manifestation).

84.     The HCC model relies on ICD diagnoses codes that are expected to be documented in the patient's medical record at the time of a face-to-face (in-person) encounter that year between a qualifying provider and patient.  Pursuant to ICD-10 coding guidelines, the ICD code selection should be based on documented conditions that require or affect patient care, treatment or management.

85.     Generally, after a face-to-face encounter between a physician and patient, the treating physician is obligated to (1) document reason of visit, chief complaint of the patient, and the medical encounter details, including a physician exam, in the patient's electronic medical record, (2) assign the disease diagnosis reflecting the patient's medical conditions, (3) document treatment plan, medications, and instructions to patient in the patient's medical record, and (4) add those diagnoses codes into the provider's electronic health records system.

86.     Additionally, CMS forbids third party involvement in the amendment of a patient claim:

> It is **unacceptable** for a third party that was not involved
> in the treatment and evaluation of the patient (e.g., coder,
> reviewer) to amend the medical record or query the

24

provider for additional diagnoses or clarifications not documented in the original medical record.

(original emphasis)

87. The provider then submits the diagnosis (ICD) codes to its MA Organizations. The MA Organizations, in turn, submit these diagnoses codes to the Medicare Program through what is known as the Risk Adjustment Processing System ("RAPS") and through the Encounter Data System ("EDS").

88. The Medicare program maps each patient's risk adjusting ICD diagnoses codes to HCCs, and then calculates each patient's risk adjustment score to determine the capitated payment.

89. Every month, the Medicare program pays the MA Organizations the capitation amount as established by the bid and adjusted using its risk adjustment methodology for each patient.

90. The MA Organizations then distribute contractually determined percentages of these payments to providers and other entities with which it contracts. Thus, ICD codes that map to HCC codes materially impact the amount of the payments made by the Medicare program to an MA Organization, and therefore, to Aledade and the Aledade Providers who contract directly with the MA Organizations.

25

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

91.    MA Organizations can reimburse providers through a variety of arrangements, all with the same outcome: the more money Medicare pays the MA Organizations, the more money the MA Organization pays to Aledade, and the Aledade Providers involved in the claims submission process.

92.    MA Organizations, healthcare providers and other entities like Aledade that cause the submission of claims to the Medicare program certify in those contracted arrangements that they have knowledge and will comply with applicable Medicare requirements and written guidance that require accurate risk adjusting diagnoses codes (ICD codes) to determine and make accurate capitation payments for each patient under Medicare Advantage. "Accurate risk-adjusted payments rely on the diagnosis coding derived from the member's medical record." 42 C.F.R. §§ 422.504(i)(3)(iii) and 422.504(l)(3)

## 2.    MSSP

93.    Healthcare providers can also utilize value-based care arrangements that incentivize higher quality care. A value-based care arrangement is a reimbursement model that ties payment for healthcare services to the quality of care provided, rather than the quantity of services performed. Under this model, commercial insurers or CMS reward providers for efficiency and effectiveness.

26

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

94.     These value-based arrangements often take the form of an ACO or Affordable Care Organization that CMS describes as:

> groups of doctors, hospitals, and other health care providers, who come together voluntarily to give coordinated high-quality care to their Medicare patients. The goal of coordinated care is to ensure that patients get the right care at the right time, while avoiding unnecessary duplication of services and preventing medical errors. When an ACO succeeds both in delivering high-quality care and spending health care dollars more wisely, the ACO will share in the savings it achieves for the Medicare program.

95.     Aledade Providers accept patients insured under Affordable Care Act (ACA) commercial marketplace health plans, Medicaid, Medicare fee-for-service, Medicare Advantage, and other types of insurance. A provider (independently or through an ACO) must enter contracts with each payor—a private insurance company or the Government— in order to provide services to patients enrolled on their plans.

27

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

96. Government programs adopting a value-based care approach include the Medicare Shared Savings Program (MSSP) for ACOs with Providers that accept beneficiaries of "traditional" Medicare, and Medicare Advantage for Aledade Providers that contract with MA Plans.

97. The MSSP and Medicare Advantage utilize the same risk adjustment HCC model to compute the annual "benchmark" (or expected) spending for a provider.

98. However, while payments under Medicare Advantage are paid on a capitated, monthly basis as explained above, the MSSP works slightly differently. Under the MSSP, at the end of the year, CMS compares actual expenditures with the expected expenditures. When actual expenditures are less than expected expenditures, the ACO and Aledade Providers "share" in the savings to the Medicare program. The ACO and Aledade Providers may also share risk of losses when actual expenditures exceed expected expenditures.

**B. Aledade Contracts with MAOs**

99. While Aledade Providers contract with MA Plans to provide healthcare services to Medicare patients enrolled through those MA Plans, Aledade contracts through wholly owned limited liability corporations (LLCs) to provide administrative support services and coding guidance to those Aledade Providers.

28

The regulatory and contractual obligations for Aledade and Aledade Providers are the same: both must certify the accuracy and truthfulness of the data they submit, or cause to be submitted, to MA Plans for the purpose of calculating capitated payments from the Medicare program.

### 1. Aledade ACOs

100.   Aledade owns and operates several ACOs, which are comprised of independent primary care providers within a geographic region that want to participate in commercial contracts or Government savings programs.

101.   "Aledade operates an Accountable Care Organization comprised of physicians, facilities and/or hospitals who are contracted with Aledade to participate in an active and ongoing program to evaluate and modify practice patterns of the provider participants."

102.   Aledade ACOs operate across at least the following 32 states and account for over 800 healthcare providers:

29

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172



103. Collectively, through its value-based care arrangements, Aledade ACOs serve over 1.75 million patients.

104. Aledade attracts Providers to join an Aledade ACO by highlighting the increased reimbursement opportunities under Aledade's guidance:

> **Healthcare providers won't be able to rely on traditional revenue models forever.** The Centers for Medicare and Medicaid Services (CMS) and many commercial payers are using numerous financial levers to put pressure on providers to improve quality and reduce costs. Aledade helps turn those pressures into clear and attainable opportunities to deliver better care, strengthen

30

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

relationships with your patients, and **secure long-term sustainability for your practice.**

(emphasis added)

105.    To support its ACOs and Providers, Aledade formed limited liability corporations (LLCs) with the same names as its ACOs ("Aledade LLCs"). Aledade is the sole owner of those Aledade LLCs.

106.    As of March 2021, Aledade formed, owns and operates at least 78 Aledade LLCs.

107.    Aledade maintains direct ownership and control over the Aledade ACOs and these Aledade LLCs. Each Aledade ACO's leadership is comprised of Aledade employees. Further, on information and belief, contracts on behalf of an Aledade LLC are signed by a senior Aledade executive officer, and the contracts provide Aledade's headquarter address and contact information. The intent is for Aledade to "share[] in the risk and reward of value-based contracts with the participating independent practices."

### 2.    Aledade's Providers' and Aledade LLCs' Contracts with MA Organizations

108.    Numerous Aledade Providers provide healthcare services to Medicare patients enrolled in Medicare Advantage plans, and Aledade's involvement in Medicare Advantage continues to grow.

31

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

109. The Aledade Providers (also known as, Aledade Participants) who intend to treat Medicare patients enter into separate distinct agreements with MA Plans to become MA Plan Providers: "The direct provision of health care and medical services that are normally provided by licensed medical personnel to individuals [Medicare patients] will be provided by Aledade Providers who each have entered into a legally enforceable agreement with [an MA Plan] . . . ."

110. Once Aledade Providers contract with MA Plans, they can provide services to Medicare patients who "designated [that] Aledade Provider as their primary care physician."

111. As of 2021, Aledade Providers were providing services to at least 100,000 Medicare patients who elected MA Plans for their Medicare insurance. This number doubled from the previous year, and likely will significantly increase in 2022 with the addition of several new Medicare Advantage agreements.

112. To support its Providers' work on behalf of the MA Plans, Aledade LLCs also contract with MA Plans to "implement[] quality improvement, practice efficiency and population management programs with its Aledade Participants [Aledade Providers who contracted with a MA Plan] that are designed to manage and improve quality, efficiency and health care experience of members enrolled in Medicare Advantage plans (Members) in a cost effective manner and desire[] to

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

make available practice improvement, office management, and population health tools to Aledade Participants to support their medical practices and facilitates meeting these goals." On information and belief, these contractual arrangements were consistent for other Aledade LLCs and MA Plans.

113. Further, these MA Plan – Aledade LLC contracts were intended to "provide certain administrative and support services, clinical documentation, improvement initiatives and other resources necessary for the efficient day-to-day administration of the non-medical aspects of Aledade [Provider's] operations."

114. Aledade LLCs first contracted with MA Plans for these specific "support services" in 2017. Since then, as of March 2021, Aledade LLCs entered into at least 27 contracts with MA Plans ("Medicare Advantage agreements"), spanning 11 states. These Medicare Advantage agreements were entered into by at least 25 Aledade LLCs.

115. These Aledade LLCs contracted with MA Plans to provide "[a]dministrative support services includ[ing] but [] not limited to education on proper documentation and coding for Medicare Risk Adjustment."

116. Aledade Providers at more than 215 practices assess, diagnose, and treat Medicare Advantage patients based, in part, on the various Medicare Advantage agreements to which Aledade Providers are parties.

33

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

117.    The Aledade LLCs service Aledade Providers affiliated with some of the largest Aledade ACOs. In particular, Aledade Providers in six of the top ten largest Aledade ACOs, as of March 2021, participate in Medicare Advantage. Collectively, these six ACOs account for over 293,000 lives under management.

118.    The 3 largest Aledade ACOs, as of March 2021, include Aledade Providers who participate in Medicare Advantage:

| Ranking | ACO Name | Lives Under Management | Number of Providers |
|---------|----------|------------------------|---------------------|
| 1. | NC West ACO | 91,423 | 82 |
| 2. | NC Supergroup ACO | 57,466 | 8 |
| 3. | NC East ACO | 53,103 | 58 |
| | **Total** | **201,992** | **148** |

119.    As of April 2022, the specific MA Organizations that contracted with Aledade Providers varied by state:

| ACO State | Medicare Advantage Organization |
|-----------|----------------------------------|
| Pennsylvania | Humana; UnitedHealthcare |
| North Carolina | BCBS NC; Humana; UnitedHealthcare |
| West Virginia | Humana; Aetna |
| Delaware | Humana; Aetna |

34

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

| Louisiana | BCBS Louisiana; Humana; Aetna |
|-----------|-------------------------------|
| Utah | Aetna; Regence |
| Oregon | Regence |
| Georgia | Aetna; UnitedHealthcare |
| New Jersey | UnitedHealthcare; Horizon BCBS |
| Arkansas | Humana |
| Kansas | Aetna; Humana; UnitedHealthcare |

120. The MA Plans compensate Aledade LLCs for their administrative services based on a contractually determined percentage of premiums from Medicare payments. All payments from MA Plans are derived from federal funds received by the MA Plan from CMS. On information and belief, these contractual arrangements were consistent for other Aledade LLCs and MA Plans.

121. The greater the MA Plan payment to the Aledade Providers, the greater amount paid to the Aledade LLCs. On information and belief, these contractual arrangements were consistent for other Aledade LLCs and MA Plans.

### 3. Aledade's Responsibilities Under Medicare Advantage

122. Under Medicare Advantage, there are "first tier, downstream, and related entities." A first-tier entity refers to a "party that enters into a written arrangement, acceptable to CMS, with an MA organization . . . to provide

35

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

administrative services or health care services for a Medicare eligible individual under the MA program." 42 C.F.R. §§ 422.2, 422.500 and 422.504(i).

123. A downstream entity is a "party that enters into a written arrangement, acceptable to CMS, with persons or entities involved with the MA benefit, below the level of the arrangement between an MA organization . . . and a first-tier entity." 42 C.F.R. § 422.2.

124. There are several different entities that are involved in Aledade's Medicare Advantage scheme as alleged in this Complaint:

| Entity | Description | Examples from Aledade's Scheme | Roles |
|---|---|---|---|
| **Medicare Advantage Organization (MA Organization or MAO) & MA Plan** | A public or private entity that is certified by CMS as meeting the MA contract requirements and which provides health benefits coverage to Medicare patients under the Part C program | Humana Aetna Regence UnitedHealthcare BCBS NC BCBS LA | • Receive diagnoses codes from Aledade Providers<br>• Submit claims to CMS<br>• Receive capitated payment from CMS<br>• Pay Aledade Providers and Aledade LLCs per contractual arrangements |

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

| First-tier entity (also called an "intermediary") | Any party that enters into a written arrangement, acceptable to CMS, with an MAO to provide administrative or healthcare services for patients insured under Medicare Advantage | Aledade Providers that enter into Medicare Advantage contracts with MA Plans to provide healthcare services to Medicare patients | • Assess and diagnose patients in face-to-face visit<br>• Submit diagnoses codes to MA Plan |
|---|---|---|---|
| Downstream Entity | Any party that enters into a written arrangement, acceptable to CMS, with persons or entities involved with the MA benefit, but below the level of the first-tier entity | Aledade LLCs that also contract with MA Plans to provide support services in documentation and coding to Aledade Providers that contract with MA Plans | • Provide administrative support and coding guidance to Aledade Providers<br>• Cause diagnoses codes to be submitted from Aledade Provider to MA Plan, and ultimately, CMS<br>• Receive payment from MA Organizations per contractual arrangement |

125.   Aledade Providers are first-tier entities that enter into Medicare

Advantage agreements with MA Plans to provide healthcare services to Medicare

patients.  42 C.F.R. §§ 422.2, 422.500 and 422.504(i).

37

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

126.   Aledade LLCs are downstream entities that also contract with MA

Plans to provide support services in documentation and coding to Aledade

Providers that contract with MA Plans. 42 C.F.R. §§ 422.2, 422.500 and

422.504(i).

127.   When contracting with MA Plans, Aledade "agree[d] to cooperate

with and assist [MA Plan] in its efforts to comply with its Medicare Advantage

contract(s) and/or Medicare Advantage rules and regulations and to assist [MA

Plan] in complying with corrective action plans necessary for [MA Plan] to comply

with such rules and regulations."

128.   First-tier entities and downstream entities must also agree in their

contracts with the MA Organizations to comply with all applicable Medicare laws,

regulations, and CMS instructions, perform their services in accordance with the

MA Organization's contractual obligations to the Medicare program, and take

measures to prevent fraud, waste and abuse.  Furthermore, if the entity generates

(or helps generate) data relating to an MA Organization's claims for payment, it

must certify the accuracy, completeness, and truthfulness of that data. 42 C.F.R. §§

422.504(i)(3)(iii), 422.504(i)(4)(v) and 422.504(l)(3).

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

129.  Aledade certified to MA Plans that it would be responsible for ensuring that the data submitted to the MA Organization and subsequently to Medicare for payment would be "accurate, complete and truthful":

> Aledade agrees and shall require Aledade Providers to agree to provide to [MA Plan] accurate and complete information regarding the provision of Covered Services by Aledade Providers to Members ("Data") on a complete CMS 1500 or UB 92 form . . . or such other form as may be required by law when submitting claims and encounters in an electronic format . . . .  The submission of the Data to Humana and/or CMS shall include a certification from Aledade Providers that the Data is accurate, complete and **truthful.**

130.  To support that Data, Aledade also agreed to "maintain custody of all files and records relating to the operations of Aledade [and] facilitate [the MA Plan's] access to Member's records in the possession of Aledade Providers, and Aledade Provider's proper recording and reporting of health data including but not limited to encounter data, hierarchical condition codes (HCCs) and lab data related

39

to any claims considered under the reimbursement contemplated by this MA Agreement."

131.   Aledade LLCs' Medicare Advantage agreements also expressly required it and its downstream entities "to be bound by and comply with the provisions of all applicable state and/or federal laws, rules and regulations." Specifically, Aledade Providers and its downstream entities, like Aledade LLCs

> Agree to comply with and be subject to all applicable Medicare program laws, rules and regulations, reporting requirements, and CMS instructions as implemented and amended by CMS. This includes, without limitation, federal and state regulatory agencies' including, but not limited to, HHS, the Comptroller General or their designees rights to evaluate, inspect and audit Aledade's operations, books, records, and other documentation and pertinent information related to Aledade's obligations under the MA Agreement, as well as all other federal and state laws, rules and regulations applicable to individuals and entities receiving federal funds.

40

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

132.    Aledade certified repeatedly that it was responsible for ensuring the accuracy, truthfulness, and completeness of Aledade Providers' claims data submissions and compliance with Medicare Advantage agreements.

133.    Aledade's growth in recent years demonstrates its increasing focus on profiting from the Medicare Advantage and other non-MSSP value-based arrangements. As of August 2019, Aledade had only 17 non-MSSP value-based care partnerships—a number which more than doubled within three years. By 2022, Aledade has 55 non-MSSP value-based care arrangements. Collectively, these non-MSSP value-based care arrangements account for over 880,000 lives under management.

134.    Aledade anticipated that these non-MSSP value-based care arrangements, including Medicare Advantage agreements, would generate $78 million in revenue in 2021.

135.    And Aledade is investing in its Medicare Advantage business. In January 2021, Aledade received $100 million in funding from private equity investors, including Meritech Capital, Tiger Global Management, IVP, and OMERS Growth Equity. Aledade plans to use this significant influx of capital to focus on growing its strategic partnerships with MA plans.

41

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

136.	In commenting on the $100 million investment, Aledade CEO and co-founder Farzad Mostashari recognized Aledade's **"remarkable growth in Medicare Advantage."**

137.	This recent round of investment follows another $64 million funding round in April 2020, with investments from GV (formerly Google Ventures), OMERS Growth Equity, Echo Health Ventures, California Medical Association, and Meritech Capital.

138.	Further, Aledade has recently created a new wing of the company, Aledade Care Solutions, to expand into the provision of health services. Specifically, Aledade will now provide wraparound care solutions to supplement the healthcare Aledade Providers provide to patients with serious and chronic illness.

139.	As part of this growth, Aledade acquired Iris Healthcare, which provides Comprehensive Advance Care Planning services such as creating care plans for patients with serious and chronic illness and connecting patients to Palliative Care, Hospice, and other healthcare resources.

140.	This new expansion allows Aledade to connect with patients across the country, to further profit from patients with more direct access to their medical records, and to identify additional opportunities for revenue at the taxpayers'

42

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

expense and to the detriment of fragile patients. Aledade's influence in the healthcare field is continuing to grow.

141.   Aledade views Medicare Advantage as another opportunity to profit, and it employs numerous tactics to cause the inflation of patients' risk adjusting diagnoses. Aledade's fraudulent scheme has caused and continues to cause the submission of false and fraudulent claims to the Government.

## IV.   THE FRAUD SCHEME

### A.   The "Gravy Sitting in the Chart"—Exploiting Medicare Advantage

142.   Aledade knowingly and fraudulently maximized payments made by the Government under Medicare Advantage for its own financial gain.

143.   High value HCC diagnoses are those diagnoses that carry weight in Medicare Advantage's risk adjustment model—i.e. those risk adjusting diagnoses that track to an HCC, which increase a patient's risk adjustment score, which leads to greater capitated Government payments to the MA Plans (and to first tier and downstream entities like Defendant Providers and Aledade).

144.   Certain high value HCC diagnoses are most commonly subject to waste, fraud, and abuse.

145.   In a report released September 2021, HHS-OIG studied Medicare Advantage companies' fraud on the system through health risk assessments, i.e.,

43

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

using a patient visit as a vehicle to fraudulently add diagnoses to the patient's medical record, and conducting reviews *after* the patient assessment (retrospective chart reviews) to fraudulently add diagnoses to the patient's medical record (both part of the fraudulent scheme alleged in this Complaint).

146. HHS-OIG found that 12 health conditions accounted for two-thirds of risk adjusted payments, resulting in $3.4 billion in payments from the Government in one year:



Exhibit 4: For 20 MA companies, 12 health conditions drove billions in risk-adjusted payments from chart reviews and HRAs.

| Condition | Amount |
|---|---|
| Vascular Disease | $610M |
| Major Depressive, Bipolar, and Paranoid Disorders | $533M |
| Diabetes With Chronic Complications | $390M |
| Chronic Obstructive Pulmonary Disease | $349M |
| Morbid Obesity | $339M |
| Congestive Heart Failure | $309M |
| Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | $196M |
| Myasthenia Gravis/Myoneural Disorders/Guillain–Barré Syndrome/Inflammatory and Toxic Neuropathy | $156M |
| Drug/Alcohol Dependence | $135M |
| Metastatic Cancer and Acute Leukemia | $122M |
| Protein–Calorie Malnutrition | $118M |
| Specified Heart Arrhythmias | $112M |

Source: OIG estimation of 2017 payment amounts using 2016 MA encounter data from CMS's IDR.

147. Providers and their coding and billing staff must follow specific coding guidelines before diagnosing patients with these high value HCC diagnoses. And, like all other risk adjusting diagnoses, a provider may submit these diagnoses

44

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

only if they were determined, evaluated or confirmed during the face-to-face visit with the patient and are supported by documentation in the medical record on the date of service.

148. Falling within HHS-OIG's concerns of the billions paid for those high value HCC diagnoses, Aledade instructed its Providers to fraudulently add unsupported high value HCC diagnoses because of the potential increase in revenue they both stood to receive: "A small difference, like 1%, in average risk score up or down can have an impact. **Risk coding is a small thing that can pay dividends when done right over and over again**." (emphasis added).

149. A key strategy of Aledade leadership was to increase revenue by falsifying high value HCC diagnoses, causing the submission of false and fraudulent claims to increase claims paid by the Government.

150. One key step in Aledade's long term planning was its expansion in the Medicare Advantage market as profit-generating enterprise. Aledade's Medicare Advantage agreements became an increasing focus of its business model and its strategic, long-term revenue planning.

151. Aledade viewed its expansion in the Medicare Advantage market as a lucrative new business line that could generate up to $100 million in new annual revenue in three years.

45

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

152. In its list of 2021 priorities, one of Aledade's Key Results was to "[e]stablish strategic relationships that help drive practice growth (at least 30 practices per state) in two states."

153. In order to achieve these strategic relationships with insurers, Aledade instructed ACOs (through Aledade LLCs) to "[p]re-negotiate broad set of products (e.g. always include MA [Medicare Advantage]) for all payers." Aledade recognized that its Providers' patients were an opportunity to add high value HCC diagnoses and to fraudulently inflate payments from the Government, and it sought to ensure that every future contract would include the opportunity to diagnose Medicare Advantage patients as part of this fraudulent scheme.

154. Aledade also viewed expanding its Medicare Advantage agreements as a solution to one problem: the lost potential savings/reimbursement when a traditional Medicare patient switched to Medicare Advantage. Without a Medicare Advantage agreement, Aledade would lose on the inflated Medicare Advantage payments. With an agreement, Aledade could still realize profits from inflated claims paid by the Government under Medicare Advantage.

155. Aledade articulated goals in pursuit of these long-term strategies to firmly establish itself in the Medicare Advantage market.

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

156. Because Aledade's Medicare Advantage strategy required a higher budget to implement, Aledade recognized that its achievements in this market "Need[] to put us in top performer bucket in the eyes of payers [MA Plans]."

157. To garner the business from the MA Plans, Aledade promised MA Plans they would realize savings from executing Medicare Advantage agreements with Aledade. The "savings" from these contracts are realized when patients are made to appear sicker than they are but do not actually need the health care services they would have used had they had really been sick.

158. Aledade dedicated significant time and resources to achieving its long-term "MA [Medicare Advantage] Deep Strategy" and "Medicare Advantage Strong Strategy" so Aledade Providers did not miss any opportunities to fraudulently add high value HCC diagnoses for Medicare Advantage patients.

159. The fraudulent practices in this Complaint were directed by Aledade leadership to maximize payments from the Government and support Aledade's long-term revenue strategy.

160. Aledade's and Defendant Providers' fraudulent scheme paid dividends in the form of millions of dollars in increased revenue they received as a result of false and fraudulent claims submitted to and paid by the Government.

47

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

### 1. Causing Providers to Submit Falsified Diagnoses to MA Plans

161.    Aledade knowingly caused its Providers to submit falsified high value HCC diagnoses to MA Plans through patient assessments.  These false diagnoses led to false or fraudulent claims submitted to the Government, and the Government paid those claims.

162.    Aledade leadership recognized that Medicare Advantage created opportunities to "gam[e]" the risk adjustment system exactly as alleged in this Complaint.

163.    Aledade leadership, including Aledade Medical Directors, masterminded and directed the fraudulent coding scheme alleged in this Complaint.

### a.    Instructing Providers to Use Annual Wellness and Chronic Care Management Visits to Falsify High Value Diagnoses

164.    Aledade instructed its Providers to utilize Annual Wellness Visits and Chronic Care Management Visits as vehicles to fraudulently add high value HCC diagnoses.

165.    Aledade instructed its Providers to schedule Medicare patients for Annual Wellness Visits (AWVs). An AWV was represented to be a "once yearly,

48

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

prevention-focused visit that includes a health risk assessment and a preventive care plan."

166. However, Aledade used AWVs as a vehicle for Aledade Providers to fraudulently add high value HCC diagnoses to patient records, underscoring HHS-OIG's concern that Part C first tier and downstream entities like Aledade and Aledade Providers "may use HRAs [health risk assessments that occur during an AWV] mainly as a tool to collect diagnoses and increase payments to MAOs rather than to improve the health of beneficiaries."

167. Aledade promoted the fraudulent addition of high value HCC diagnoses through several mechanisms in violation of Medicare requirements by directing its Providers to: (1) prioritize patients with the highest potential risk adjustment; (2) add risk adjusting diagnoses during AWVs without the required medical documentation; (3) add risk adjusting diagnoses that were not evaluated during the patient visit; and (4) add risk adjusting diagnoses during Chronic Care Management (CCM) visits without the required medical documentation. The same diagnoses targeted for inflation by Aledade were the same diagnoses that HHS-OIG found were fraudulently inflated in an analysis of diagnoses added during an AWV:

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

**Exhibit B-1: Estimated 2017 risk-adjusted payments resulting from diagnoses reported on HRAs, by HCC**[a]

| HCC | HCC Description | Risk-Adjusted Payments From In-Home HRAs | Risk-Adjusted Payment From Facility-Based HRAs | Risk-Adjusted Payments From All HRAs |
|---|---|---|---|---|
| HCC58 | Major Depressive, Bipolar, and Paranoid Disorders | $353,868,747 | $80,752,433 | $434,621,180 |
| HCC108 | Vascular Disease | $307,397,936 | $73,541,303 | $380,939,239 |
| HCC18 | Diabetes With Chronic Complications | $173,205,866 | $30,291,494 | $203,497,360 |
| HCC111 | Chronic Obstructive Pulmonary Disease | $141,810,708 | $43,594,247 | $185,404,955 |
| HCC22 | Morbid Obesity | $142,061,471 | $36,915,440 | $178,976,911 |
| HCC85 | Congestive Heart Failure | $114,760,158 | $20,451,517 | $135,211,675 |
| HCC75 | Myasthenia Gravis/Myoneural Disorders and Guillain-Barré Syndrome/ Inflammatory and Toxic Neuropathy | $102,878,201 | $8,805,499 | $111,683,700 |
| HCC55 | Drug/Alcohol Dependence | $59,412,704 | $18,759,051 | $78,171,755 |
| HCC88 | Angina Pectoris | $67,379,225 | $5,040,813 | $72,420,038 |

168.    First, Aledade directed its Providers to prioritize Medicare patients with the highest value for risk adjustment. Aledade generated a list of these higher value patients and directed its Providers to schedule and prioritize their AWVs to add these high value HCC diagnoses without clinical evaluation and diagnosis.

169.    As of January 2021, Aledade updated its Aledade App so that Medicare Advantage patients would be a top priority for AWVs before traditional Medicare patients for wellness visits at any time of the year.

170.    Second, Aledade told its Providers that new diagnoses in AWVs do not need supportive documentation or confirmation of a diagnosis – directly contrary to Medicare requirements.

50

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

171.   "Why is this [AWV] an optimal time for Risk coding?" According to Aledade's fraudulent instructions:

- "AWVs require the provider to review all of a patient's chronic conditions.

- This makes the AWV **an excellent opportunity for the provider to submit diagnosis codes without the need to document** all of the components of the medical decision-making process that would be required in a regular E&M visit.

- Listing ALL ICD-10 codes for ALL of the patient's chronic conditions on your AWV claim is expected and appropriate. **This communicates the patient's overall health status, without implying that you evaluated or treated these conditions that day.**"

(emphasis added)

172.   Aledade's instruction contradicted Medicare requirements that every diagnosis must be supported by the patient's medical record, and AWVs are no exception to the rule.

173.   At least one Aledade Regional Medical Director expressed concern about Aledade's instructions to diagnose without any supporting documentation. This Regional Medical Director found Aledade's "standard" education (that AWVs

51

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

did not require M.E.A.T. [Monitoring, Evaluating, Assessing, Treating] criteria) to be a "point of anxiety" because he was taught (properly) "that some additional documentation was needed" to support diagnoses.

174.    Third, documentation aside, Aledade instructed that AWVs were "an opportunity to code ANYTHING," even if the Provider did not ever discuss the issue with the patient. That instruction was again contrary to Medicare requirements and directly led to the fraudulent increase of Medicare Advantage payments. A condition that was not discussed, evaluated, or documented with clinical support during the patient visit could not influence patient care, treatment, or management during that visit, as required by the Medicare program.

175.    Aledade prompted these fraudulent diagnoses by populating high value HCC diagnoses on a patient's "problem list" before the visit. Aledade made sure that the problem list and Aledade App prompted risk adjusting diagnoses that would match to an HCC and affect a patient's risk score: "Find patients with known diabetes complications, obesity, and depression and change their problem list independent of a visit to ensure a specific, weighted code is used."

176.    Aledade knowingly suggested high value HCC diagnoses that were unsupported to ensure optimal coding, leading to the submission of false claims paid by the Government.

52

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

177.   Fourth, Aledade compelled its Providers to improperly use Chronic Care Management (CCM) visits as a vehicle to falsify diagnoses, similar to AWVs. On information and belief, Aledade's instructions to improperly use CCM visits to add high value HCC diagnoses were consistent for Providers serving traditional Medicare patients and Medicare Advantage patients.

178.   CCM visits focus on characteristics of advanced primary care such as support for chronic diseases. CCM visits are typically provided outside of face-to-face patient visits.

179.   Just like AWVs, Aledade fraudulently instructed its Providers to add high value HCC diagnoses during these CCM visits.

180.   Aledade's scheme to improperly utilize CCM visits had financial consequences for the Government and likely medical consequences for patients. For example, one Aledade Provider had over $100,000 in unweighted codes that a Care Manager (CM) converted to weighted, risk adjusting diagnoses codes.

181.   Further, while CCM visits were performed by Aledade Provider Care Managers (often Registered Nurses) and AWVs often performed by Aledade Provider clinical staff (and not the Provider him or herself), risk adjusting diagnoses codes for both were billed under the Aledade Providers' names and NPIs. On information and belief, several Aledade Providers even gave blanket

53

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

permission to their clinic staff to add all possible high value HCC diagnoses codes to patients' records, without confirmation or verification by the Provider in the face-to-face assessment.

182.    Aledade instructed its Providers to use any opportunity – AWVs or CCM – to add high value HCC diagnoses, in violation of Medicare requirements. Aledade embraced this increased number of provider-patient interactions to push fraudulent diagnosing guidance on Aledade Providers, resulting in even more false claims submitted to and paid by the Government.

183.    On information and belief, Aledade is also exploiting opportunities for telehealth appointments due to the COVID pandemic as additional vehicles to add falsified diagnoses.

184.    Aledade leadership knew that its instructions to add unsupported high value HCC diagnoses during an AWV was improper:

- "We need to restate that we are no longer promoting and/or stating that 'you can drop all the codes on an AWV claim'"

- "historically a[n AWV] visit [was] seen as an opportunity to code ANYTHING even if you do not address it in a visit. But this is currently under scrutiny"

54

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

185.   Because of Aledade's continuing practice of fraudulently instructing Providers to use all types of patient visits, including AWVs, CCM visits, and telehealth visits, as vehicles to add unsupported high value HCC diagnoses, false or fraudulent claims have been submitted or caused to be submitted to the Government and the Government has paid those claims.

### b.   "Aledade Gospel": Instructing Providers to Falsely Diagnose "the 5 Ds"— High Value Diagnoses

186.   Aledade knowingly instructed its Providers to fraudulently diagnose patients with high value HCC diagnoses that were unsupported by the patient's medical record, resulting in greater reimbursements from the Government to MA Plans (and to Aledade and Aledade Providers). Aledade's focus was single-minded: promote and use risk adjusting diagnoses that attach to weighted HCCs.

187.   Aledade authored numerous documents, referred to as cheat sheets, coding master sheets, or quick reference guides, and presentations, in which it erroneously instructed Aledade Providers on how to add high value HCC diagnoses to maximize payments, often including the risk adjustment score associated with each potential diagnosis so Aledade Providers understood the dollar value that could attach to each high value diagnosis.

188.   To avoid detection of its fraudulent scheme by the Government, Aledade leadership devised coding practices that it believed would raise fewer red

55

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

flags and be "less controversial" such as focusing on "our [5] Ds and our app suggestions, [because] there is plenty of untapped [risk] opportunity there."

189. Aledade fraudulently instructed its Providers to diagnose "the 5 Ds" to increase risk adjustment: (1) Diabetes with Complications; (2) Depression; (3) "Diet of Donuts = Obesity"; (4) "Drinking = Alcohol Use/Abuse/Dependence"; and (5) "Drugs = Drug Use/Abuse/Dependence."

190. According to Aledade, these "5 Ds" were elusive and counted for a significant percentage of missed risk opportunity to add risk adjusting diagnoses to patient records. Collectively, Diabetes with Complications, Depression, and Obesity represented almost two-thirds of all overall risk opportunity for Aledade patients.

191. Aledade instructed its Providers to focus on these "5 Ds" during a patient visit because of the "better risk lift" they provide. While Aledade recognized that the risk adjustment resulting from these diagnoses may be less significant than other, more severe, diagnoses, using a "baseball analogy these are singles but they still score runs"—especially when these fraudulent diagnoses are pushed for over 100,000 Medicare Advantage patients.

192. Aledade's instructions reminded its Providers about Aledade's bottom line: increased revenue from gaming the risk adjustment system. Accordingly, in

56

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

its guidance to Aledade Providers, Aledade associated a high value HCC diagnosis with the potential revenue from its addition. This is improper because it usurps medical judgment; Aledade Providers' determination as to whether to add a diagnosis of a patient should not be guided by financial incentives. CMS guidance reflects this strong aversion to informing healthcare providers about the economic impact of coding decisions.

193.    Yet Aledade constantly reminded its Providers about significant potential "Risk coding opportunities," linking diagnoses directly to dollar values. In one instance, Aledade provided this reminder:

- $738,510 for Major Depressive, Bipolar, and Paranoid Disorders

- $543,600 for Diabetes with Chronic Complications

- $360,000 for Morbid Obesity.

194.    Aledade pressured its Providers to capture the "elusive" "5 Ds" to maximize potential reimbursement from the Government.

### i.    Diet of Donuts = Obesity

195.    One of the "5 Ds" promoted by Aledade was what Aledade called, "Diet of Donuts = Obesity," by example. Aledade reminded its Providers that a diagnosis of Morbid Obesity Due to Excess Calories was worth ~$2,500 to the

57

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

ACO's benchmark when coded annually compared to a diagnosis of obesity only, which carried no value in a risk adjustment calculation.

196. According to the ICD-10-CM Coding Guidelines, "BMIs [body mass index] should only be assigned when there is an associated, reportable diagnosis (such as obesity)." This is because BMI is a vital sign like blood pressure. As such, BMI is not a standalone diagnosis, but it can further support an obesity diagnosis that otherwise exists.

197. Contrary to this clinical limitation of relying on BMI, Aledade instructed its Providers that BMI alone was a sufficient basis to diagnose a Medicare patient with Morbid Obesity to capture that high value HCC diagnosis in the HCC risk adjustment model.

198. Aledade instructed its Providers to always code morbid obesity (which is risk adjusting), rather than obesity, unspecified (which is not risk adjusting) or overweight based on nothing more than BMI.

199. Aledade Providers coded morbid obesity for traditional Medicare patients under the MSSP over 10 times the national average. Aledade's CEO was particularly interested in studying the results for Medicare Advantage patients. On information and belief, Aledade's fraudulent scheme caused similar disproportionately high morbid obesity coding for Medicare Advantage patients.

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

200.    In 2021, Aledade's Chief Medical Officer acknowledged that the coding guidance for morbid obesity directed at Providers was wrong: "team, we are always learning and [the Senior Medical Director of Risk and Wellness Product] has opened our eyes to a few pieces of long existing **Aledade gospel** that may require re-education." (emphasis added).

201.    Yet Aledade never disclosed that its coding guidance for morbid obesity was wrong or reimbursed the Government for payments owed because of Providers following this guidance.

202.    Defendant Providers across different geographic regions selected the risk adjusting morbid obesity diagnosis as compared to unweighted obesity at disproportionately high rates—more than 95 out of every 100 patients—because of Aledade's fraudulent instructions:

| | | Morbid Obesity | |
| --- | --- | --- | --- |
| **ACO Name** | **Defendant Provider** | **% Risk Adjusting** | **Count** |
| NC East ACO | Coastal Carolina Internal Medicine | 95.38% | 165 |
| DE ACO | Mid-Atlantic Family Practice | 98.35% | 119 |
| LA 2016 ACO | Natchitoches Medical Specialists | 97.92% | 47 |
| DE ACO | Sussex Internal Medicine, LLC | 100% | 40 |
| NC East ACO | Valley Internal Medicine | 100% | 33 |

59

### ii.  Depression

203.  Aledade also fraudulently promoted and directed the selection of other high value HCC diagnoses. For depression, Aledade consistently instructed its Providers to select one of several risk adjusting major depressive disorder diagnoses, which "All carry the same HCC Score: 0.33 = $3,300" every year.

204.  Aledade pushed its Providers away from unweighted depression diagnoses codes. For example, Aledade asked its Providers about their workflow "to ensure F32.9 [Major Depression, Single Episode, Unspecified] is not billed in [the] practice" and "to reduce the incidence of non-weighted [depression] HCC codes billed by [the] practice." This is because the F32.9 diagnosis code "carries NO risk weight. Zero. Zip. Nada." Rather, Aledade directed its Providers to several high value HCC diagnoses in lieu of F32.9 or other unweighted diagnoses codes for depression.

205.  Further, Aledade conflated serious diagnoses like anxiety into depression because an anxiety diagnosis carries no risk adjustment weight in Medicare's HCC risk adjustment model.

206.  As a result of Aledade's fraudulent coding guidance for depression, Aledade Providers selected risk adjusting depression diagnoses compared to unweighted depression diagnoses at disproportionately high rates. As just one

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

example, Aledade touted the success of multiple Aledade Providers in Kansas—

including Defendant Providers—which selected weighted depression diagnoses

codes more than 90% of the time, compared to unweighted depression codes. This

means that, for every 100 patients diagnosed with depression by these Providers,

more than 90 patients were diagnosed with a risk adjusting major depression

diagnosis:

## Kansas ACO Depression Coding



| ACO Name | Practice Name | Depression | |
| --- | --- | --- | --- |
| | | Unweighted | Weighted |
| Kansas 2016 ACO | Post Rock Family Medicine | 1.92% | 98.08% |
| | Complete Family Care | 2.50% | 97.50% |
| | Lawrence Family Practice Center | 2.56% | 97.44% |
| | CenterPointe Physicians PA | 6.78% | 93.22% |
| | Family Care Center | 8.70% | 91.30% |
| | Stonecreek Family Physicians LLP | 8.97% | 91.03% |
| | Andover Family Medicine | 9.64% | 90.36% |

On information and belief, many Aledade Providers in Kansas participated in

Medicare Advantage at the time this data was generated and currently participate

in Medicare Advantage.

207.   This pattern is consistent for Defendant Providers participating in

Medicare Advantage across different geographic regions. These Providers

disproportionately diagnosed major depression and other risk adjusting depression

61

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

diagnoses, compared to unweighted depression diagnoses because of Aledade's

fraudulent coding instructions:

|  |  | Depression | |
|---|---|---|---|
| ACO Name | Provider Name | % Risk Adjusting | Count |
| DE ACO | Stoney Batter Family Medicine | 96.75% | 387 |
| WV 2016 ACO | Dunbar Medical Associates | 97.95% | 383 |
| DE ACO | Mid-Atlantic Family Practice | 95.80% | 251 |
| WV 2016 ACO | Williamson Health & Wellness Center Inc | 95.79% | 205 |
| DE ACO | Beshara Helou MD (Georgetown) | 99.00% | 199 |
| DE ACO | Primary Care of Delaware | 91.62% | 153 |
| NC East ACO | Coastal Carolina Internal Medicine | 94.04% | 142 |
| DE ACO | Delaware Primary Care, LLC | 97.24% | 141 |
| DE ACO | Sussex Internal Medicine, LLC | 97.78% | 88 |
| LA 2016 ACO | Natchitoches Medical Specialists | 94.87% | 74 |
| NC West ACO | Gaston Medical Associates | 98.15% | 53 |
| NC East ACO | Valley Internal Medicine | 100% | 53 |
| DE ACO | Family Practice Associates | 97.78% | 44 |

### iii.    Diabetes with Complications

208.    Similarly, Aledade instructed its Providers to always diagnose

diabetes with complications: "Diabetes w/OUT Complications holds a risk weight

of 0.104 in the HCC model, while Diabetes WITH Complications has a [greater]

risk weight of 0.318." According to Aledade, "To *roughly estimate* the extra

62

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

amount of money Medicare expects to spend based on a diagnosis, multiply each

0.1 increase in risk score by $1,000," resulting in an estimation of more than

$3,000 per weighted diabetes diagnosis. (original emphasis)

209.  Aledade instructed its Providers to diagnose with the greater valued

"diabetes WITH complications" even if the patient's diabetes was under control or

the complicating factor no longer existed.

210.  Aledade knew its diabetes coding instruction was erroneous—"What

is your message to the provider when the risk suggestion is diabetes with

complications, but the physician says that since the diabetes is controlled by diet,

that it is uncomplicated?" – and prepared to shut down its Providers when they

expressed hesitation or concern with its instruction.

211.  This pattern is consistent for Defendant Providers participating in

Medicare Advantage across different geographic regions. These Providers

disproportionately diagnosed diabetes with complication diagnosis, compared to

diabetes without complication because of Aledade's fraudulent coding instructions:

| | | Diabetes with Complication | |
|---|---|---|---|
| ACO Name | Provider Name | % Risk Adjusting | Count |
| NC East ACO | Clinton Medical Clinic | 92.12% | 1,473 |
| WV 2016 ACO | Dunbar Medical Associates | 98.52% | 600 |
| DE ACO | Primary Care of Delaware | 90.88% | 548 |

63

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

| DE ACO | Beshara Helou MD (Georgetown) | 98.45% | 445 |
|--------|-------------------------------|--------|-----|
| NC East ACO | Coastal Carolina Internal Medicine | 99.31% | 429 |
| DE ACO | Stoney Batter Family Medicine | 93.30% | 418 |
| WV 2016 ACO | Williamson Health & Wellness Center Inc. | 92.33% | 397 |
| NC West ACO | Gaston Medical Associates | 97.20% | 208 |
| NC Supergroup ACO | Med First | 90.43% | 170 |
| DE ACO | Family Practice Associates | 97.40% | 150 |
| DE ACO | Sussex Internal Medicine, LLC | 100% | 94 |

### iv. Drinking and Drugs

212. For drug and alcohol use, abuse, and dependence ("substance use diagnoses"), Aledade promoted how risk adjusting alcohol diagnoses all carry "HCC weight = 0.368 = $3,680," and risk adjusting opioid diagnoses all carry an "HCC score: 0.42 = $4,200."

213. Aledade directed the use of risk adjusting diagnosis code F10.99 indicative of "alcohol use" "as a safe harbor for [Alcohol] Abuse and Dependence to enable coding of those conversations since many find it easier to swallow [a falsified diagnosis of alcohol] 'use,'" compared to alcohol abuse or dependence that may alarm the Medicare patient to discover in their record.

214. Aledade even directed its Providers to add a risk adjusting diagnosis based on lifestyle choices, such as patients over 65 years old who had more than

64

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

one drink per day, and especially for patients "who have no other HCC [risk adjustment] opportunities."

215. Because of Aledade's fraudulent coding guidance for substance use diagnoses, Aledade Providers selected weighted substance use diagnoses codes compared to unweighted codes at disproportionately high rates. In Delaware, "Sussex Int [Defendant Sussex Internal Medicine, LLC] is #2 in the state" for substance use diagnoses, selecting weighted substance use diagnoses 97.5% of the time compared to unweighted substance use diagnoses. In other words, Aledade Providers at Sussex Internal Medicine, LLC would have selected risk adjusting substance use diagnoses for at least 97 patients out of every 100 patients.

216. This pattern is consistent for Defendant Providers participating in Medicare Advantage across different geographic regions. These Providers disproportionately diagnosed risk adjusting substance use, compared to unweighted substance use diagnoses because of Aledade's fraudulent coding instructions:

|  |  | Substance Use |  |
|---|---|---|---|
| ACO Name | Provider Name | % Risk Adjusting | Count |
| NC Supergroup ACO | Med First | 99.27% | 136 |
| WV 2016 ACO | Dunbar Medical Associates | 94.64% | 106 |
| DE ACO | Beshara Helou MD (Georgetown) | 93.02% | 40 |

65

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

| WV 2016 ACO | Williamson Health & Wellness Center Inc | 100% | 26 |
| DE ACO | Delaware Primary Care, LLC | 93.33% | 14 |

217. Further, several Defendant Providers diagnosed extremely high numbers of patients with substance use disorders. For example, Defendant Med First in North Carolina diagnosed patients with substance use disorder almost as much as depression and obesity combined. Aledade's fraudulent instructions to diagnose substance use disorder based on lifestyle choices paid off with these high numbers of risk adjusting substance use diagnoses codes fraudulently submitted to the Government and paid by the Government in inflated amounts.

218. Despite its clear contractual obligations to ensure the accuracy of data, including diagnoses codes, submitted to MA Plans, Aledade knowingly promoted and directed fraudulent coding guidance for these "5 Ds" and other high value diagnoses.

219. Aledade Medical Directors were offered to Aledade Providers as coding experts. These Medical Directors were often responsible for the false and fraudulent coding guidance to Aledade Providers. However, many Medical Directors lacked the proper certifications or significant coding background or experience, and knowingly promoted false coding guidance without ensuring their accuracy.

66

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

220.   Aledade leadership relied on one of these Regional Medical Directors who promoted fraudulent coding instructions to increase risk adjustment for direct input on Aledade's long term strategy to exploit Medicare Advantage.

221.   At the same time that Aledade disclaimed responsibility for accurate coding guidance by shifting responsibility and blame to Providers, upon information and belief, Aledade also told Providers that its coding guidance was accurate and instructed Aledade Providers to adhere to that guidance. But Aledade knowingly pushed fraudulent coding guidance to Providers to increase high value HCC diagnoses codes, contrary to Medicare requirements."

222.   Aledade could not properly disclaim responsibility for accurate and truthful diagnoses coding of Medicare patients because it certified in its agreements with the MA Organizations that it would do exactly that – certify to CMS that "the [Aledade Provider] Data is accurate, complete and truthful."

223.   Aledade's fraudulent scheme worked as intended. For example, one "top risk uptake large practice[]" in Medicare Advantage, Defendant Natchitoches Medical Specialists in Louisiana, demonstrated disproportionately high weighted versus unweighted diagnoses codes across several diagnosis categories:

- o   Weighted cardiology = 100%

- o   Weighted depression = 94.87%

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

- o Weighted diabetes = 88.89%

- o Weighted nephrology = 81.82%

- o Weighted obesity = 97.92%

224.    Similarly, other Defendant Providers selected risk adjusting diagnoses at disproportionately high rates across the same diagnosis categories:

- Coastal Carolina Internal Medicine in North Carolina:

  - o Weighted cardiology = 100%

  - o Weighted depression = 94.04%

  - o Weighted diabetes = 99.31%

  - o Weighted nephrology = 91.30%

  - o Weighted obesity = 95.38%

  - o Weighted substance use = 100%

- Delaware Primary Care, LLC in Delaware:

  - o Weighted cardiology = 98.92%

  - o Weighted depression = 97.24%

  - o Weighted diabetes = 87.50%

  - o Weighted nephrology = 100%

  - o Weighted obesity = 86.39%

  - o Weighted substance use = 93.33%

68

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

- Sussex Internal Medicine, LLC in Delaware:

    o Weighted cardiology = 100%

    o Weighted depression = 97.78%

    o Weighted diabetes = 100%

    o Weighted nephrology = 100%

    o Weighted obesity = 100%

    o Weighted substance use = 97.50%

- Dunbar Medical Associates in West Virginia:

    o Weighted cardiology = 99.54%

    o Weighted depression = 97.95%

    o Weighted diabetes = 98.52%

    o Weighted nephrology = 97.67%

    o Weighted obesity = 68.52%

    o Weighted substance use = 94.64%

- Walnut Bottom Family Practice, LLC in Pennsylvania:

    o Weighted cardiology = 100%

    o Weighted depression = 100%

    o Weighted diabetes = 97.96%

    o Weighted nephrology = 100%

69

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

- Weighted obesity = 100%

- Weighted substance use = 100%

225. Aledade's fraudulent instructions were consistent across diagnoses, geographic regions, and providers: select the diagnosis code with high risk adjustment value in order to maximize payments. Aledade leadership knowingly caused the submission of false and fraudulent claims to the Government by instructing Aledade Providers to select these false ICD-10 diagnoses codes; and the Government paid those claims.

### 2. Programming the Aledade App to Fraudulently Default to High Value Diagnoses

226. Aledade sealed the deal on its campaign to ensure that Aledade Providers applied its erroneous coding instructions during AWVs and CCM visits through the use of rigged electronic software (the Aledade App). Aledade programmed its App to usurp clinical judgment by defaulting to high value HCC diagnoses and pressuring providers to select these diagnoses.

227. Aledade's primary business model, which depended upon value-based care arrangements, purported to utilize technology to promote provider efficiency. However, Aledade knowingly used this technology to facilitate the submission of fraudulent diagnoses on a massive scale, causing the submission of false or fraudulent claims to the Government.

70

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

228. Aledade created a digital application called the "Aledade App" for Aledade Providers to use in their assessments and diagnoses of patients. The Aledade App defaulted to high value, risk adjusting diagnoses by focusing on weighted codes that attach to a greater HCC and result in a higher risk score for the patient. According to one Regional Medical Director who supported Aledade Providers: "For DE in HCC 55 which includes drug and alcohol Use Abuse and Dependence there is $1M of opportunity in the app already so the app is still #1 place to look."

229. On information and belief, Aledade was successful in using electronic software to further its fraudulent scheme. For instance, Aledade enabled an electronic default to "morbid obesity" instead of "overweight" or "obesity (unspecified)" to make it easier for Aledade Providers to select that weighted code based only on BMI. For at least one Medicare Advantage Provider, Defendant Family Practice Associates, the default to high BMI led to the use of significantly more (87.88%) weighted obesity codes compared to unweighted obesity codes.

230. Also, on information and belief, Aledade installed its App for all Aledade Providers, and distributed its knowingly faulty coding guidance to them.

231. Aledade also data mined to target the Providers to pressure. If the coding data showed that a Provider was not selecting high value HCC diagnoses

71

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

like obesity, substance use, diabetes with complications, and cardiology, Aledade populated that Provider's App with the high value diagnoses codes or added high value diagnoses directly to the Provider's electronic health records systems. For example, for the high value morbid obesity code, Aledade programmed Providers' electronic health records systems to default to high Body Mass Index (BMI), thereby increasing the submission of morbid obesity codes and payment of higher claims by the Government.

232.   Aledade closely monitored the rate at which Aledade Providers added high value HCC diagnoses during patient visits. Aledade used multiple internal tools and data analytics dashboards to monitor Providers' progress and the rate at which Providers were "viewing" or "billing" these suggested risk adjusting diagnoses. And Aledade paid keen attention to Providers who were not viewing and billing risk suggestions at a high enough rate to maximize risk adjustment potential, without any insight into the Providers' health assessment of the patient during the face-to-face visit.

233.   Aledade knew that without pressure its Providers would not independently diagnose patients with serious diseases, so Aledade prompted Providers' selections with "risk suggestions" in the Aledade App that Aledade then pressured Providers to view and accept. Appreciating that "[r]isk suggestions that

72

are viewed are over *THREE TIMES more likely to be resolved*," Aledade set goals for its Providers to view 80 percent of suggested risk adjusting diagnoses (original emphasis).

234. As a result, Aledade Providers more frequently viewed Aledade's suggested risk adjusting diagnoses for Medicare Advantage patients compared to traditional Medicare patients. Specifically, Aledade Providers of Medicare Advantage patients viewed more than half of Aledade's suggested risk adjusting diagnoses, resulting in the fraudulent submission of high value HCC diagnoses codes.

235. But that wasn't enough. Aledade wanted all its Providers to view and bill for these risk suggestions for Medicare Advantage patients; so, Aledade sought to increase its "more than half" success rate by another "20 percentage point increase in suggestions viewed with new risk measure defined and rolled out," and to increase the rate at which these risk suggestions were selected.

236. Aledade also employed staff who interfaced with its Providers (Practice Transformation Specialist or PTS) to direct and pressure them to view and accept more high value HCC diagnoses suggested by Aledade. These PTSs provided direct trainings to Aledade Providers and their staff on how to select risk adjusting diagnoses, how to best utilize the Daily Huddle function of the Aledade

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

App to identify risk adjusting diagnoses, and "Optimize practice workflow for incorporating HCC opportunities and 'Daily Huddle' utilization."

237. Aledade programmed its App differently depending on its Providers' metrics. At its baseline, the Aledade App was programmed to "suggest" high value HCC diagnoses. Aledade followed up with these Providers with the high-pressure tactics alleged in this Complaint, leading the Providers to submit false claims to the Government. Aledade also tracked and monitored how many of these risk "suggestions" the Provider viewed and billed. By tracking its Providers, Aledade was able to pressure them to select the high value HCC diagnoses. Where Providers fell short of risk adjustment goals, Aledade programmed the App to populate only with high value HCC diagnoses codes.

238. Aledade programmed the App to limit the Provider's selections to high value HCCs instead of no value or unweighted diagnoses.

239. Not only did the Aledade App default to high value HCC diagnoses, Aledade also sent its Providers a "consistent message to 'disable unweighted codes'" in the electronic health record to prevent diagnoses codes that had no financial value in terms of Medicare Advantage payments from populating in the patient's record.

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

240.   Aledade's use of electronic software to push and automate patient diagnoses even contrary to the patient's clinical presentation at the AWVs and CCM visits is the antithesis of quality care for our nation's most vulnerable population: Medicare patients. And, coupled with Aledade's scheme to maximize the number of patient visits and to further falsify diagnoses during these visits, Aledade knowingly caused the submission of false and fraudulent claims to the Government on a routine basis. This led to the submission of false and fraudulent claims paid by the Government.

### 3.   Use of Retrospective Chart Reviews to Falsely Add High Value Diagnoses

241.   Aledade conducted chart reviews and facilitated Provider-directed chart reviews to direct, pressure, and facilitate its Providers to add high value HCC diagnoses after a patient face-to-face assessment for submission to MA Plans. Such retrospective chart reviews led to false and fraudulent claims submitted to and paid by the Government.

242.   In blatant disregard of Medicare requirements, Aledade leadership directed the addition of high value HCC diagnoses to the claims after the patient assessment, as shown by one communication between Aledade CEO and its Chief Medical Officer:

75

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

Aledade CEO: "have you ever heard of submitting a $0.00 or $0.01 claim with 99499 CPT code for additional diagnoses? (maybe even those found later on chart review?)"

Aledade Chief Medical Officer: **"Don't our practices fear this would trigger risk of audit?** (whether warranted or not)"

Aledade CEO: "I'd never heard of it before"

(emphasis added)

243.  The Aledade Implementation and Training Coordinator (now Clinical Coding Lead) also promoted this coding practice: "Good morning, funny you would ask this as I have just begun researching it again as **it was allowing this on the advantage plans** and some had their own dummy cpt code to identify. This code is on the qualifying list so it can be used. You would and could create a secondary claim form with that code and the additional diagnosis codes. **I am trying to get someone to run a claim for me using it and follow it through to make sure we get paid and it doesn't deny and that it doesn't get paid on the .01."** (emphasis added)

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

244. Aledade instructed a Provider's biller or coder to query the patient's aggregated medical claims record using the Daily Huddle tool on the Aledade App and suggest to the Aledade Provider additional risk adjusting diagnoses to add to the record. This was considered the easy part: "The problem is finding a way to have the MAC/CMS re-adjudicate a claim with no change in CPT/payment."

245. Because of concerns "that [Aledade Providers] are letting risk slip through their fingers," Aledade employed "chart reviews" to identify Providers that code with little to no risk adjustment value.

246. Aledade Medical Directors even showed Providers how to use electronic smart functions to scrub outbound claims so that non-weighted codes were removed from claims and high value HCC diagnoses codes could be used as replacements to increase a patient's RAF Score.

247. Aledade realized that it could game the system by adding diagnoses codes after the patient visit to fraudulently inflate claims to the Government. Aledade added these diagnoses codes undetected by the Government for Medicare Advantage patients and MSSP patients.

248. Because of Aledade's continuing practice of fraudulently adding high value diagnoses through retrospective reviews of patient medical records, false or

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

fraudulent claims have been submitted or caused to be submitted to the

Government and the Government has paid those claims.

**B.    Conspiring with Defendant Providers to Co-Promote Fraudulent Coding Practices**

249.    Aledade and Defendant Providers knowingly promoted and co-promoted coding practices that fraudulently added high value HCC diagnoses—the "gravy sitting in the chart" (according to Aledade)—to inflate false claims paid by the Government.  These Defendant Providers were complicit in the fraud scheme alleged in the Complaint in conspiracy with Aledade.

250.    Aledade and Defendant Providers were both obligated by Medicare Advantage contractual and regulatory requirements to ensure the accuracy of data submitted to MA Plans and to the Government for reimbursement.

251.    Aledade was bound by Medicare requirements in its provision of services to Aledade Providers: **"Aledade's Risk Coding Suggestions Policy** supports our own and our ACOs' compliance with the Federal False Claims Act and other statues and regulations prohibiting health care fraud." (original emphasis)

252.    As a downstream entity, Aledade's contracts with MA Plans required that it "agrees and shall require Aledade Providers to agree to provide to [MA

78

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

Plan] accurate and complete information regarding the provision of Covered Services by Aledade Providers to Members . . . ."

253.   Aledade LLCs' Medicare Advantage agreements also expressly required it and Aledade Providers "to be bound by and comply with the provisions of all applicable state and/or federal laws, rules and regulations," including "all applicable Medicare program laws, rules and regulations, reporting requirements, and CMS instructions as implemented and amended by CMS."

254.   Aledade directed its Defendant Providers to fraudulently inflate their claims to the Government and continually reminded them of their opportunity and financial incentives to do so under Medicare Advantage.  On information and belief, Defendant Providers knowingly forwarded Aledade cheat sheets and coding guidance to the Provider's billing staff or third party billing companies to fraudulently code and bill high value HCC diagnoses codes for the Provider.

255.   With Aledade's guidance, Defendant Providers also implemented their own risk adjusting initiatives to fraudulently increase reimbursements from the Government: "For those practices in with managed care contracts they are asking for providers to do just this [retrospective chart reviews to add risk adjusting diagnoses] and having some great success at capturing codes that would have been lost without doing so."

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

256.    One Aledade coding expert suggested messaging to Aledade

Providers that encouraged retrospective chart reviews for those that "are wanting

more [risk]."

257.    Defendant Providers like Post Rock Family Medicine, Stonecreek

Family Physicians LLP, Andover Family Medicine, Sussex Internal Medicine,

LLC, and Natchitoches Medical Specialists "want[ed] more," and were viewed by

Aledade as top-performing Providers because of the significant rate at which they

submitted claims to the Government for high value HCC diagnoses.

258.    Aledade even hired leaders from Defendant Providers such as Post

Rock Family Practice to further co-promote the fraudulent coding practices alleged

in this Complaint.

259.    Aledade and Defendant Providers brainstormed ways to increase high

value HCC diagnoses to obtain higher patient RAF Scores and maximize claims

paid by the Government.  For example, a Provider at Defendant Family Practice

Associates "seemed very optimistic about ending 2019 in a good place" after

Aledade staff spent "1:1 time with [the Provider] and one of his NPs to talk about

risk coding."  In turn, Aledade's Market President for Delaware said he was "glad

[this Provider] is taking accountability for improving his risk coding practices

across his team" and coordinated a visit from Aledade's Regional Medical Director

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

to further increase the Provider's risk coding potential through Aledade's fraudulent coding guidance.

260. Defendant Providers depended on Aledade's high value HCC diagnoses prompts through the Aledade App in order to reach their risk coding goals. When the Aledade App occasionally malfunctioned to omit the patient's "problem list", Care Managers were unable to meet risk coding goals because they depended on Aledade to identify high value HCC diagnoses.

261. Aledade's Chief Performance Officer tracked Defendant Providers' rates of "viewing" and "billing" risk adjusting diagnosis prompts and used those statistics to drive Defendant Providers to increase their risk coding:

- "[Defendant] Dr. Helou is viewing 28% of risk suggestions and billing 31%. This suggests that perhaps he's going off of memory. He's certainly appropriately risk coding, but not as much as he could be if he actually looked at the suggestions. Also suggests that he's coding but at less specificity (lower weighted code)."

- "[Defendant] DE Primary Care is engaging well (40% billed) with the suggestions that they are viewing (50%),

81

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

but their viewing rate is bad and needs to improve. At least

into the % 80s."

262.  Defendant Providers like Natchitoches Medical Specialists took advantage of its "risk opportunity," *i.e.,* opportunities to add fraudulent high value HCC diagnoses, and "viewed" and "billed" Aledade's risk suggestions at high rates.

263.  Beyond fraudulent risk adjusting practices, Defendant Providers capitalized on all opportunities to increase their potential savings by "[t]urn[ing] no-shows into gold": a Provider "at [Defendant] Stoney Batter Family Medicine in Delaware discovered a way to flip a potential loss in revenue to an attribution win. When a patient does not arrive on time for a scheduled appointment, she calls the patient to check in and converts the near-miss no-show into a telephone encounter with the patient."

### C.  "No Diagnosis Left Behind": Management Did Whatever It Took to Increase High Value Diagnoses

264.  As alleged throughout the Complaint, Aledade leadership at the highest levels directed and promoted the fraudulent practices.  They did whatever it took to increase high value diagnoses.

82

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

265.   One such example of Aledade leadership's singular focus on risk adjustment is its **"No Diagnosis Left Behind"** initiative whereby Aledade generated reports and monitored Providers' risk adjustment metrics.

266.   In addition to its fraudulent cheat sheets and coding guidance pushed out to Aledade Providers, Aledade Slack channels offered more opportunities for Aledade leadership to discuss the financial incentives of adding high value HCC diagnoses to patient medical records. Aledade Senior Executives hosted Slack channels primarily to discuss how to increase risk adjustment:

> Aledade Chief Performance Officer: "This room [Slack channel] has a higher weight [referencing channel's emphasis on weighted codes compared to unweighted codes]"

> Aledade Regional Medical Director: "This [Slack] channel is about getting it HCC [risk adjusting diagnoses attached to weighted HCCs] done, the other channel is about thinking about getting HCC done. Hashtag everybody drinks F10.99 [alcohol use with unspecified alcohol use disorder]"

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

Aledade Pennsylvania ACO Executive Director: "1099 =

Miscellaneous income (derived from newly coded risk)

[...] **Depression NOS [not otherwise specified] = NO$**

**= no cash**" (emphasis added)

267. Aledade leadership knowingly implemented the tools and metrics to monitor its Providers' selection of risk adjusting diagnoses:

Aledade Chief Performance Officer: "given **the coding**

**opportunity is still in the thousands and savings is in**

**the millions,** I'd say for now pick one method [to monitor

Providers' risk coding metrics] and **track that regularly.**

**We don't need either of these two reports to be perfect**

**in order for us to do what we need to do with the**

**practices.**" (emphasis added)

268. To "do what we need to do with the practices," Aledade leadership encouraged Aledade staff to pressure Aledade Providers to increase their risk adjustment coding:

Aledade Chief Performance Officer: "It is very

clear that [Regional Medical Director] and [Aledade

Arkansas ACO Executive Director] are calling out

84

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

Delaware on Core 4 performance on this Opportunity ACO board call."

Aledade Arkansas ACO Executive Director: "Oh for sure. Challenge accepted. DocJock doesn't play around. He will straight up call an under-performing doc and tell them he hates how embarrassed they must be feeling by their poor numbers. The man can throw serious shade."

Aledade Delaware ACO Executive Director: "I will send him some cell phone numbers to put on speed dial […]"

Aledade Chief Performance Officer: "I mean, Arkansas is outpacing Delaware on assignable visits. **Looks like [Arkansas Executive Director] is in a Tesla, while [Delaware Executive Director], you are in an…Audi."**

269. When Aledade Providers still missed opportunities to add high value HCC diagnoses, Aledade leadership chastised Aledade Providers to not miss these

85

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

risk adjusting diagnoses and directed Aledade staff, including Practice Transformation Specialists, to follow up with the Provider to add diagnoses.

270. When Aledade Providers failed to increase the "Average resolved risk suggestions weight per patient in [. . .] MA [Medicare Advantage] contracts," Aledade worried its 2021 revenue goal was "At Risk" and pressured Aledade Providers to further increase their rate of resolving risk suggestions.

271. And Aledade leadership continually discussed new strategies to increase a patient's risk adjustment score. One such strategy involved intentionally removing lower value or no value diagnoses from the Aledade App selection menu so that Aledade Providers could not select those diagnoses. Another strategy involved mining claims data to gather clinical facts about patients to further promote the fraudulent addition of high value HCC diagnoses.

272. Another risk strategy, promoted by former Kansas ACO Executive Director and current Regional Vice President of Provider Networks, required Aledade to identify which diagnoses were billed and which were not at each AWV, and to use that information to increase Aledade Providers' risk adjustment moving forward. Like other Aledade leaders, the focus was always on "HCC Coding. Lets dig in and figure out how to get those numbers up."

86

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

273. Aledade leadership celebrated the creativity of new risk adjustment initiatives implemented by Aledade and Aledade Providers. These initiatives included the successful implementation of backdoor maneuvers (Aledade's "workaround") to add risk adjusting diagnoses codes after a patient assessment, with Aledade's CEO seeking "confirmation" from other Aledade leadership that Aledade staff could successfully add these high value HCC diagnoses codes after-the-fact undetected by the Government.

274. Aledade leadership viewed this backdoor maneuver as an opportunity to capture high value HCC diagnoses and estimated that it would result in at least $5 million in revenue.

275. Aledade leadership attempted to hide these backdoor maneuvers from those Aledade Providers that were not complicit because it understood it was improper for third parties to add diagnoses to a patient's medical record after the patient's face-to-face visit with the Provider.

276. Aledade gamed Medicare Advantage through its continuing focus on adding risk adjusting diagnoses and increase revenue from Aledade's value-based arrangements.

87

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

**D.  Gaming MSSP**

277.  Falsifying diagnoses as alleged in this Complaint not only inflated MA Plan payments to Aledade Providers, but also helped to keep Defendants' costs low and allowed them to obtain "savings" from the sharing agreement between the Government and Aledade ACOs under the Medicare Shared Savings Program (MSSP).

278.  Even prior to gaming the Medicare Advantage risk adjustment system, Aledade's fee-for-service business model aimed to keep its Provider's actual expenditures lower than the expected expenditures to "share" in the savings that the Medicare program encouraged under the MSSP.  "For each performance year of the agreement period, ACOs share in a percentage of the savings they generate **if the expenditures of the ACO's assigned beneficiaries are below their benchmark . . ."** (emphasis added)

279.  Both Aledade ACOs and Aledade Providers financially benefitted from this arrangement.  Aledade ACOs were expected to receive 40 percent of the shared savings and Aledade Providers were expected to receive the other 60 percent.

280.  In 2020, Aledade Providers received, on average, $243 per traditional fee-for-service Medicare patient as a result of shared savings under the MSSP.

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

281. But in fact, Aledade fraudulently added high value HCC diagnoses to Medicare patients' medical records to secure those savings and avoid losses that Aledade Providers would have otherwise shared with the Medicare program.

282. Without these falsified diagnoses, Defendants' expected expenditures would have been far less than reported to the Government and when compared to the actual expenditures for these healthier patients, little to no savings would have been realized, because the actual expenses likely would have far exceeded the estimated expenses.

283. Use of fraudulent diagnoses allowed Defendants to realize "savings" – even when those "savings" were capped at 3 percent in 2019 – when either no "savings" would have been realized had accurate diagnoses been used, or worse, Defendants may have owed refunds to the Medicare program. "ACOs [. . .] must also pay CMS a percentage of shared losses if expenditures for the ACO's assigned beneficiaries for the performance year exceeds their benchmark . . . ."

284. Aledade also recognized that an Aledade Provider's quality score "DOES impact the percentage of maximum attainable share rate the ACO will be awarded." Accordingly, Aledade utilized the Aledade App to pressure its Providers to add all quality metrics that would affect the shared savings.

89

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

285.   When Aledade Providers did not add certain quality metrics, Aledade instructed billers to add CPT Category II codes—tracking codes used for quality metrics—after the patient visit.  However, Aledade told its Providers that Aledade would submit these clinical quality measures "through a combination of clinical data interfaced from your EHR [electronic health record] (wherever possible) and manual chart reviews completed by you [the Provider] in the MAeHC portal."  On information and belief, Aledade fraudulently inflated its Providers' quality metrics to realize greater savings under the MSSP.

286.   Further, because Aledade was gaming the risk adjustment system before 2019, Aledade enjoyed a 3 percent "savings" on top of an already fraudulently inflated benchmark amount.

287.   Aledade also participates in a Medicare Advantage incentive program through which it receives additional compensation for meeting certain quality goals and implements a bonus program to incentivize its Aledade Providers.

288.   On information and belief, Aledade shared millions of dollars of MSSP savings with its Providers based on these false representations.

## V.   MATERIALITY

289.   Defendants knew that truthful reporting of data, including patient diagnoses, was material to the Government's decision to pay claims under

90

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

Medicare Advantage.  Defendants also knew that truthful records and statements in support of claims were material to the Government's decision to pay.

290.   Some of the factors in evaluating materiality under the False Claims Act include (a) statutory, regulatory and contractual language, (b) whether the violations go to the heart of the benefit of the bargain, (c) whether the violations were serious and material and not merely technical or minor infractions of rules, (d) the Government's actions relative to similar violations, (e) whether any reasonable person would attach importance to Defendants' choice of actions, and Defendants' knowledge relative to these factors.  All of these factors demonstrate materiality in this case and have been addressed throughout this Complaint.

291.   Defendants knowingly submitted or caused to be submitted thousands of false or fraudulent claims and used false records and statements in support of those claims, under Medicare Advantage, in violation of laws designed to protect this country's most vulnerable patient population.

292.   More specifically, Defendants knowingly submitted or caused to be submitted data, including false diagnoses codes, and false records and statements in support of that data, to MA Organizations, knowing that the data would be used by the Government to calculate Medicare payments and were material to the Government's decision to pay claims.

91

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

293. In turn, those fraudulent claims were submitted to the Government, and the Government paid those claims.

294. As addressed, the Medicare program makes payments to MA Organizations based on diagnoses reported by Aledade Providers, as a result of Aledade's coding instructions, and the MA Organizations share those payments with Aledade and Aledade Providers. United States ex rel. Swoben v. United Healthcare Ins. Co., et al., 848 F.3d 1161, 1167 (9th Cir. 2016) (explaining that "[t]he risk adjustment methodology relies on [patient] diagnoses").

295. As such, "the Medicare Advantage capitation payment system is subject to the False Claims Act." United States ex rel. Silingo v. Well Point, Inc., 904 F.3d 667, 673 (9th Cir. 2018).

296. The United States Department of Justice has enforced the False Claims Act against other entities in Medicare Advantage for the same or similar conduct as alleged in this Complaint.

297. In October 2021, the Department of Justice filed a Complaint in Intervention against an MA Organization and related provider groups for allegedly submitting inaccurate diagnoses codes to the Medicare program for Medicare Advantage beneficiaries. The Department of Justice targeted the defendants' fraudulent practice of adding risk adjusting diagnoses that were not actually

92

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

addressed during the patient visit or that were not supported by the requisite documentation in the medical records. https://www.justice.gov/opa/pr/government-intervenes-false-claims-act-lawsuits-against-kaiser-permanente-affiliates (Kaiser Permanente)

298. In September 2021, the Department of Justice filed a Complaint in Intervention against an MA Organization, a related intermediary, and a senior executive officer, alleging that the intermediary caused the submission of unsupported claims by coding conditions that were not documented or discussed during the patient visit. Further, the defendants failed to take corrective action to delete unsupported diagnoses once it became aware of the unsupported diagnoses codes. As part of this litigation, another MA Organization previously agreed to pay more than $6 million to resolve the False Claims Act allegations against it. https://www.justice.gov/opa/pr/united-states-intervenes-and-files-complaint-false-claims-act-suit-against-health-insurer (Independent Health and DxID); https://www.justice.gov/opa/pr/medicare-advantage-provider-pay-63-million-settle-false-claims-act-allegations (Kaiser Foundation Health Plan of Washington, formerly Group Health Cooperative)

299. In March 2020, the Department of Justice brought a False Claims Act action against an MA Organization for falsely certifying the accuracy of risk

93

adjusting diagnosis data it submitted to the Medicare program for payments under

Medicare Advantage and for knowingly failing to delete inaccurate diagnoses

codes, which caused the Government to pay inflated payments to the MA

Organization. https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-files-

civil-fraud-suit-against-anthem-inc-falsely-certifying (Anthem)

300.　In October 2018, a Medicare Advantage healthcare provider paid a

$270 million False Claims Act settlement on behalf of a large independent

physician association it had acquired. This physician association allegedly caused

MA Organizations to submit incorrect diagnoses codes to the Medicare program

and obtain inflated payments, including through disseminating improper medical

coding guidance to physicians. https://www.justice.gov/opa/pr/medicare-

advantage-provider-pay-270-million-settle-false-claims-act-liabilities (DaVita)

301.　In August 2021, a healthcare services provider and affiliated entities

paid a $90 million False Claims Act settlement to resolve allegations that it

knowingly submitted unsupported risk adjusting diagnoses codes to Medicare, and

that it failed to take sufficient corrective action to remedy the fraud, which inflated

the risk scores of the beneficiaries and led to the MA Organizations being overpaid

for certain encounters with Medicare Advantage patients.

94

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

https://www.justice.gov/opa/pr/sutter-health-and-affiliates-pay-90-million-settle-false-claims-act-allegations-mischarging (Sutter Health)

302.  In August 2019, a Medicare Advantage provider and physician paid $5 million to settle False Claims Act allegations that they reported invalid diagnoses codes to Medicare Advantage plans and thereby caused those plans to receive inflated payments from the Government.

https://www.justice.gov/opa/pr/medicare-advantage-provider-and-physician-pay-5-million-settle-false-claims-act-allegations (Beaver Medical Group L.P.)

303.  In May 2017, an MA Organization paid over $30 million to settle False Claims Act allegations that it engaged in a fraudulent scheme to maximize payments under Medicare Advantage, including through compelling practices to schedule annual wellness visits as a vehicle to add falsified diagnoses and increase capitated payments from the Government.

https://www.justice.gov/opa/pr/medicare-advantage-organization-and-former-chief-operating-officer-pay-325-million-settle; Case No. 8:09-cv-1625, Sewell v. Freedom Health, Inc. Second Amended Complaint, ¶¶ 168 and 169 (Freedom Health)

304.  These cases demonstrate that Defendants' same or similar conduct alleged in this Complaint was material to the Government's decision to pay claims.

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

305. And the facts alleged in this Complaint show that Defendants were well aware of the statutory, regulatory and contractual requirements under Medicare Advantage and that their alleged conduct went to the very heart of the bargain under Medicare Advantage.

306. Medicare expects and requires that claims are paid for healthcare services for patients that are based on accurate and truthful diagnoses. The Medicare Program's requirement for complete, accurate and truthful reporting of patient diagnoses (ICD codes) goes directly to the "essence of the bargain." It is neither "minor nor insubstantial." Diagnoses directly affect payment and are the very essence of the Medicare payment system; their accuracy is material to the Medicare program's decision to make payments to its MA Organizations (which are then paid to first tier and downstream entities like Defendants). Their inaccuracy can also have serious negative impact on patient health and safety, which makes the conduct alleged in this case particularly troubling.

307. Defendants' violations of the statutory, regulatory, and programmatic requirements were serious and material, leading to actual or potential patient harm, and were made with at least reckless disregard of the seriousness of their violations.

96

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

308.   Defendants' violations were not immaterial or inadvertent technical mistakes in processing paperwork, or simple and honest misunderstanding of the rules, terms and conditions, or certification requirements.  Rather, Defendants knowingly failed to comply with material legal obligations and certifications.

309.   In short, there is ample evidence to show that Defendants knew or should have known that their violations had the natural tendency to influence the Government's decision to pay the Medicare claims and that any reasonable person would attach importance to Defendants' choice of action.

## VI.   UNLAWFUL RETALIATION

310.   Relator repeatedly informed Aledade Management of concerns related directly to the allegations set forth in the Complaint.  Relator was troubled that Defendants were engaged in unlawful practices alleged in this Complaint.  Relator also feared job security and the legal propriety of Defendants' actions.

311.   Yet, Relator was reprimanded, retaliated and discriminated against and terminated by Aledade when raising concerns related to, and objecting to, Defendants' fraudulent course of conduct alleged in this Complaint.

312.   Relator was employed by Aledade, Inc. as "Senior Medical Director of Risk and Wellness Product", from January 4, 2021, through his termination on May 10, 2021.

97

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

313. Relator was terminated because of lawful acts by Relator to stop one or more violations of the False Claim Act and lawful acts by Relator in furtherance of an action under 31 U.S.C. § 3730.

314. During his employment, Relator observed, then investigated and opposed, among other things, the violations of the False Claims Act, "upcoding" of HCC-related diagnoses codes, improper queries to providers in violation of Medicare requirements, inaccurate medical diagnoses guidance including inaccurate "cheat sheets" offered to providers to encourage and pressure upcoding through recording false diagnoses and other practices alleged in this Complaint.

315. Relator gathered documents related to the violations of the False Claims Act alleged in this Complaint, constituting investigation in furtherance of an action under 31 U.S.C. §3729 et seq., and in addition Relator communicated in good faith with his management, leadership, and human resources his opposition to the various alleged unlawful practices and to discrimination and retaliation he perceived was being directed against him.

316. As an example of the latter, on February 24, 2021, Relator emailed Aledade's Chief Medical Officer and Deputy General Counsel and SVP-Compliance after receiving feedback from an outside consultant. The consultant said some of the materials were "an invitation to upcode" and that "'cheat sheets'

98

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

full of risk-adjustment values" increased risk to Aledade "should they be audited." Relator forwarded the email and added, "I feel my worst nightmare is coming true regarding the HCC code harvesting practices which I am always opposed to doing regarding the risk adjustment program. [. . .] We need to address this immediately."

317.    Thereafter, Relator's employment as Senior Medical Director of Risk and Wellness Product was terminated by Aledade in retaliation for his investigation and opposition activities following a hostile working environment which Aledade had created because of these same retaliatory and discriminatory actions.  Aledade's purported reasons for terminating Relator are pretextual.

318.    As a proximate cause of the fraudulent practices alleged in this Complaint, Relator has suffered damages in the form of lost wages, damage to his career (future earning capacity), general damages for emotional distress, and other actual damages including but not limited to the tax consequences of receiving a recovery in a different year than the loss was suffered, and/or attorneys' fees and costs of suit.  Relator is entitled to these damages, as well as double the amount of back pay, interest on the back pay and compensation for any special damages sustained as a result of the discrimination, retaliation and termination, including

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

litigation costs and reasonable attorneys' fees, and all other remedies and recompense allowable under 31 U.S.C. § 3730(h).

## VII.    COUNTS

### COUNT I
### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(A)

319.    The allegations in the preceding paragraphs are incorporated by reference.

320.    Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

321.    The United States paid for claims that otherwise would not have been allowed.

322.    Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act, and liable for all other relief authorized by the statute.

323.    As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

### COUNT II
### Federal False Claims Act:

100

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

**31 U.S.C. § 3729(a)(1)(B)**

324.    The allegations in the preceding paragraphs are incorporated by reference.

325.    Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729 (a)(1)(B).

326.    The United States paid for claims that otherwise would not have been paid.

327.    Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act, and liable for all other relief authorized by the statute.

328.    As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

**COUNT III**
**Federal False Claims Act:**
**31 U.S.C. § 3729(a)(1)(C)**
**Conspiracy**

329.    The allegations in the preceding paragraphs are incorporated by reference.

101

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

330.   Defendants knowingly conspired to commit a violation of the False Claims Act, in violation of 31 U.S.C. § 3729 (a)(1)(C).

331.   The United States paid for claims that otherwise would not have been allowed.

332.   Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act, and liable for all other relief authorized by the statute.

333.   As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

## COUNT IV
### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(G)

334.   The allegations in the preceding paragraphs are incorporated by reference.

335.   Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729 (a)(1)(G).

102

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

336.   The United States paid for claims that otherwise would not have been allowed.

337.   Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act, and liable for all other relief authorized by the statute.

338.   As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

**COUNT V**
**Retaliation of Relator in Violation of False Claims Act**
**31 U.S.C. § 3730(h)**

339.   The allegations in the preceding paragraphs are incorporated by reference.

340.   This is a claim pursuant to 31 U.S.C. § 3730(h), which prohibits retaliation by an employer against an employee who engaged in efforts to stop what the employee reasonably believed are violations of the False Claims Act.

341.   Relator engaged in lawful acts in furtherance of efforts to stop one or more violations of 31 U.S.C. § 3729 *et seq*, as detailed in this Complaint.

342.   Because of Relator's lawful acts, Defendant Aledade subjected Relator to discrimination and retaliation as alleged in this Complaint, and

103

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

ultimately terminated Relator on May 10, 2021, for engaging in protected activity, namely for raising, objecting to and refusing to participate in fraudulent conduct alleged in this Complaint.

343.    Defendant Aledade's retaliation against Relator was a violation of 31 U.S.C. § 3730(h).

344.    As a consequence of Defendant Aledade's violations of 31 U.S.C. § 3730(h), Relator suffered damages in the form of lost wages, damage to his career (future earning capacity), general damages for emotional distress, and other actual damages including but not limited to the tax consequences of receiving a recovery in a different year than the loss was suffered, and/or reasonable attorneys' fees, expenses and costs of suit.

345.    Relator is entitled to these economic losses and all other remedies and recompense allowable under 31 U.S.C. § 3729(h).

### COUNT VI
### Wrongful Discharge
### in Violation of Law and Public Policy

346.    Relator was subjected to a hostile working environment and his employment was terminated because he investigated and opposed illegal practices alleged in this Complaint while acting in furtherance of this action under the False Claims Act.  This conduct violates 31 U.S.C. §3730(h).  As a separate claim

104

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

arising out of similar facts, this conduct constitutes the tort of Wrongful Discharge in Violation of Public Policy as that tort may be defined in the statutory or common laws of Washington State and any other relevant State.

**WHEREFORE**, Relator, on behalf of Relator and the United States, prays:

(a)  That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of any amount within the applicable statutory ranges, for each violation;

(b)  That Relator be awarded an amount that the Court decides is reasonable for recovering the proceeds of the action, including but not necessarily limited to the civil penalties and damages, on behalf of the United States, which, pursuant to the False Claims Act, shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the Government intervenes and proceeds with the action, and not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim if the Government does not intervene;

(c)  That Relator receive all relief necessary to make Relator whole for Defendant Aledade's violations of 31 U.S.C. § 3730(h);

105

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

(d)     That the Court order Defendant Aledade to award Relator front pay in lieu of reinstatement;

(e)     That Relator receive an award of two times back pay, including the value of lost benefits and equity;

(f)     That Relator receive an award of compensatory damages in an amount to be proven at trial for the economic, reputational, and emotional harm Relator experienced as a result of Defendant Aledade's unlawful conduct;

(g)     As a proximate cause of the fraudulent practices described in this Complaint, Relator has suffered damages in the form of lost wages, damage to his career (future earning capacity), general damages for emotional distress, and other actual damages, including but not limited to, the tax consequences of receiving a recovery in a different year than the loss was suffered, and/or attorneys' fees and costs of suit;

(h)     That judgment be entered against Defendants jointly and severally, in the amounts to be determined at trial; and

(i)     That Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

106

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172

(j)     That the Court order prejudgment interest and such other relief as is

appropriate and that the Court shall deem as just and equitable.

## VIII.    JURY DEMAND

Trial by jury is hereby requested.

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Dated: May 24, 2022

Respectfully submitted,

_(signature)_ _(signature)_

| | |
|---|---|
| **STEPHEN A. TELLER** | **RENÉE BROOKER** |
| Bar No. 23372 | (*Pro Hac Vice* pending) |
| Teller Law | D.C. Bar No. 430159 |
| 1139 34th Ave | **EVA GUNASEKERA** |
| Seattle, WA 98122 | (*Pro Hac Vice* pending) |
| (206) 324-8969 | D.C. Bar No. 502542 |
| 860-3172 (fax) | **JACLYN TAYABJI** |
| Steve@stellerlaw.com | D.C. Bar No. 1766350 |
| | Tycko & Zavareei LLP |
| | 1828 L Street NW |
| | Suite 1000 |
| | Washington, DC 20036 |
| | (202) 417-3664 |
| | (202) 973-0950 (fax) |
| | reneebrooker@tzlegal.com |
| | eva@tzlegal.com |
| | jtayabji@tzlegal.com |

FIRST AMENDED COMPLAINT
No. 21-cv-0410-JHC

Teller Law
1139 34th Ave
Seattle, WA 98122
(206) 324-8969 Fax: 860-3172